UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER M. FLETCHER, EOIN M. PRYAL, SECOND AMENDMENT FOUNDATION, INC., and COMMONWEALTH SECOND AMENDMENT, INC. <br> Plaintiffs, <br><br> v. <br><br> ROBERT C. HAAS, in his official capacity as Cambridge Commissioner of Police, MARK K. LEAHY, in his official capacity as Northboro Chief of Police, and JASON A. GUIDA, in his official capacity as Director of the Massachusetts Firearms Records Bureau, <br> Defendants. | No. 1:11-cv-10644-DPW |

**MEMORANDUM IN SUPPORT OF DEFENDANT
JASON GUIDA'S MOTION TO DISMISS ALL CLAIMS**

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

Kenneth W. Salinger (BBO # 556967)
Assistant Attorney General, Government Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617.963.2075
ken.salinger@state.ma.us

May 19, 2011

# Table of Contents.

**Page**

Introduction and Summary of Argument. ....................................................................... 1

Legal and Factual Background. ................................................................................... 2

    1.      The Massachusetts Firearms Licensing Laws Limit the Kinds of Guns that Resident Aliens May Possess or Carry. ................................................. 2

    2.      Plaintiffs Seek Broad Relief. ......................................................................... 4

Argument. ................................................................................................................. 5

    I.      Plaintiffs' Claims All Fail As a Matter of Law. ........................................... 5

        A.      The Second Amendment Only Protects United States Citizens. ............... 5

        B.      The Equal Protection Clause Claim Adds Nothing to the Case. ............... 7

            1.      State Laws Giving Aliens Limited Rights to Bear Arms Do Not Violate the Fourteenth Amendment Because They Are Allowed by the Second Amendment. .............................................. 7

            2.      Even If In Theory the Equal Protection Clause Was Implicated, the Challenged Provisions Would Satisfy Equal Protection Because They Have a Rational Basis. .......................... 9

                a.      Alienage Is Not a Suspect Classification In These Unusual Circumstances. ..................................................... 9

                b.      Heightened Scrutiny Is Also Not Warranted on a "Fundamental Rights" Theory. ........................................ 11

                c.      The Challenged Statutory Provisions Have a Rational Basis. ................................................................ 13

    II.      At the Very Least, Plaintiffs' Claims that the Challenged Statutory Provisions Are Unconstitutional On their Face Must Be Dismissed. ................. 14

        A.      The Second Amendment Does Not Apply Outside the Home, to Large-Capacity Weapons, or to the Carrying of a Concealed Firearm in Public. ...................................................................... 15

        B.      Even If the Equal Protection Clause Gave Permanent Resident Aliens Some Right to Bear Arms, Neither Illegal Aliens Nor Non-Citizens Allowed to Enter the United States Only Temporarily Would Have Any Such Right. ................................................ 17

    III.      The Two Corporate Plaintiffs Lack Standing. ......................................... 19

Conclusion. .............................................................................................................. 20

**Introduction and Summary of Argument.**

The Commonwealth of Massachusetts allows local police chiefs to license citizens to possess and carry rifles, shotguns, and handguns, but limits resident aliens to applying for a permit to own or possess a regular capacity rifle or shotgun.  Aliens cannot obtain permission to possess a handgun or a large-capacity rifle or shotgun in Massachusetts.  Plaintiffs claim that this distinction by the Massachusetts Legislature between citizens and aliens violates the Second Amendment to the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment.

I.  Both of plaintiffs' claims should be dismissed under Fed. R. Civ. P. 12(b)(6).  The Second Amendment protects the right of United States citizens to keep and bear arms, but does not extend that protection to non-citizens (*see* pages 5-7).  Because the Second Amendment allows States to treat citizens and non-citizens differently in granting firearms licenses, laws that do so cannot violate equal protection (pp. 7-9).  Even if the Court were required to conduct some further equal protection inquiry, however, rational basis review would apply:  under these circumstances alienage is not a suspect classification (pp. 9-11), and the incorporation of Second Amendment rights into the Fourteenth Amendment does not mean that heightened scrutiny is required or permissible under the Equal Protection Clause (pp. 11-13).  A classification that mirrors the Second Amendment's distinction between citizens and aliens has a rational basis (pp. 13-14).

II.  Even if the two individual plaintiffs could press their claims that the challenged statutory provisions are unconstitutional as applied to them, the further claims that the statutes are unconstitutional on their face must be dismissed.  The challenged statutory provisions have a plainly legitimate sweep and would not violate either the Second Amendment or the Equal Protection Clause in all circumstances (pp. 14-19).  Plaintiffs seek relief that would allow aliens to possess large-capacity firearms and to carry weapons in public both openly and in a concealed manner.  But the Second Amendment does not protect any such rights (pp. 15-17).  Similarly, it would not violate equal protection to deny firearm permits to illegal aliens or to non-immigrant aliens and other aliens admitted to the United States only temporarily (pp. 17-19).

III.  Finally, the claims by the Second Amendment Foundation, Inc. ("SAF"), and Commonwealth Second Amendment, Inc. ("C2A"), must be dismissed for lack of standing (pp.

19-20).  Neither SAF nor C2A identifies any member who tried but failed to obtain a Massachusetts firearms license because she is an alien.  Indeed, C2A does not have members and makes no allegation that it functions like a membership organization.

**Legal and Factual Background.**

1. **The Massachusetts Firearms Licensing Laws Limit the Kinds of Guns that Resident Aliens May Possess or Carry.**

Aliens who reside in Massachusetts may obtain permission to possess and carry a non-large capacity rifle or shotgun in Massachusetts, at home or elsewhere, but cannot obtain a license for a large-capacity rifle or shotgun, for an assault weapon, for a handgun of any kind, or to carry a concealed weapon.  Compl. ¶ 22; Mass. Gen. L. c. 140, § 131H.[1]  The statute gives the Colonel of the Massachusetts State Police the authority to issue such a permit to non-citizens, and the colonel has delegated that authority to the Firearms Records Bureau.  *See* Compl. ¶ 8.

Massachusetts residents who are United States citizens and not otherwise disqualified may apply either for a Class A or Class B license to carry a gun or for a Firearm Identification ("FID") Card, as explained below.  An applicant who "is an alien" is not eligible for such a license or card.  Mass. Gen. L. c. 140, §§ 129B(1) &  131(d).  The statutory scheme completely disqualifies certain other categories of persons that the Legislature has determined should not be trusted with any kind of gun; those categories of person may not obtain the more limited permit offered to aliens.[2]

Massachusetts law establishes two categories of licenses to carry for otherwise eligible citizens:  Class A and Class B licenses.  *See* Mass. Gen. L. c. 140, § 131(a) and (b).  Holders of either license may obtain, possess, and carry "firearms" (a defined term that includes handguns but

---

[1]    Because § 131H does not cover large capacity rifles or shotguns—unlike, for example, § 131(b)—aliens may not possess semi-automatic weapons capable of being fitted with a device that can accept more than ten rounds of ammunition or more than five shotgun shells, and may not possess assault weapons.  *See* Mass. Gen. L. c. 140, § 121, defining "large capacity weapon."

[2]    The other statutory disqualifications include persons:  (i) convicted of a felony, a misdemeanor punishable by imprisonment for more than two years, or a violent crime; (ii) who have been hospitalized for mental illness and are still disabled by it; (iii) who have been treated or confined for drug addiction or habitual drunkenness, and are not yet cured; (iv) less than the minimum age (which is 21 years of age for a license to carry, and 15 years for an FID card); or (v) currently the subject of an abuse prevention restraining order or an outstanding arrest warrant.  *Id.*

not rifles or shotguns), "rifles," or "shotguns" in their home or in public.[3]  *Id*.  But unrestricted Class A licenses are much broader.  The holder of a Class A license may (1) "carry or possess a loaded firearm in a **concealed** manner in any public place or way," or (2) obtain, possess, or carry any "**large capacity**" firearm; a Class B licensee may not.  *Id*. (emphasis added).  "Large capacity" means a semi-automatic weapon that can hold, or that can accept a device capable of holding, more than ten rounds of ammunition or more than five shotgun shells.  *Id*., § 121.  Thus, a Class B license is sufficient to keep a regular capacity firearm, rifle, or shotgun in one's home or to carry it openly in public.  Under either kind of license, "the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper."  *Id*. § 131(a) and (b).

Subject to the categorical disqualifications discussed above, "[a]ny person residing or having a place of business" in Massachusetts may apply for a Class A or Class B license to their local police chief or the Colonel of the Massachusetts State Police.  *Id*. § 131(d).  The police chief or state police colonel may issue the license "if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason" to carry firearms.  *Id*.[4]  The police chief or colonel may "limit any license granted under § 131 to a specified purpose."  *Ruggiero v. Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 260 (1984).

To keep a rifle or shotgun in one's home or place of business, a Massachusetts resident who is a citizen only needs an FID Card.  *See* Mass. Gen. L. c. 140, § 129B.  This card does not authorize possession of a firearm except at a shooting club or range; it does not allow one to keep a handgun in one's home.  *Id*., ¶ (6).  An FID card "shall be issued" to any qualified person.  *Id*.

---

[3]  "Firearms" are weapons that can discharge a bullet and have a barrel less than 16 inches, or can discharge shot and have a barrel less than 18 inches.  A "rifle" has a rifled bore and a barrel length of at least 16 inches.  A "shotgun" has a smooth bore, a barrel length of at least 18 inches, and an overall length of at least 26 inches.  *See* Mass. Gen. L. c. 140, § 121.

[4]  A "suitable person" is someone "sufficiently responsible . . . to be entrusted with a license to carry firearms."  *Wetherbee v. Costerus*, 13 Mass. L. Rptr. 159, 2001 WL 716915, *7 (Mass. Super. Ct. 2001) (Fabricant, J.); *accord Howard v. Chief of Police of Wakefield*, 59 Mass. App. Ct. 901, 901 (2003) (affirming denial of firearm license where prior restraining orders showed applicant could "not . . . be safely entrusted with firearms" and thus was not a "suitable person").

2.     **Plaintiffs Seek Broad Relief.**

The four plaintiffs claim that the Massachusetts restrictions on possession of firearms and other guns by aliens are unconstitutional, both "on their face and as applied" to plaintiffs Christopher M. Fletcher and Eoin M. Pryal, because they purportedly violate the Second Amendment and the Equal Protection Clause.  Compl. ¶¶ 52, 54.

Fletcher and Pryal each alleges that he emigrated from the United Kingdom and now lawfully resides in Massachusetts (in Cambridge and Northborough, respectively) as a permanent resident alien.  Compl. ¶¶ 2-3, 26-27, 38.  Each claims that he applied to his local police chief for a license to carry, but does not specify whether he sought a Class A or a Class B license.  *Id.* ¶¶ 32, 45.  Fletcher and Pryal each allege that he was told he could not be granted a license to carry, and should instead seek a resident alien permit through the Massachusetts Firearms Records Bureau under Mass. Gen. L. c. 140, § 131H.  *Id.* ¶¶ 35-37, 48-49.  Neither alleges that he ever did so.  Although Fletcher and Pryal each alleges that he only wants a license to carry in order to keep a handgun "in his home for immediate self-defense," and that he did not apply for a license in order "to obtain the ability to carry a handgun on his person outside of his home," *see* Compl. ¶¶ 33-34, 46-47, the relief plaintiffs' seek is much broader than that.

Two corporations join as plaintiffs in this action:  the Second Amendment Foundation, Inc., and Commonwealth Second Amendment, Inc.  Neither corporate plaintiff claims that it has any legal right to seek or obtain a license to carry or possess a rifle, shotgun, or firearm.

Plaintiffs seek:  (i) an injunction barring defendants "from enforcing the United States citizenship requirements of M.G.L. c. 140, §§ 129B [FID cards] and 131 [licenses to carry] against the Plaintiffs" (ii) a declaration that the statutory disqualification of aliens from obtaining an FID card or a license to carry is "null and void" because it purportedly violates the Second Amendment and the Equal Protection Clause; and (iii) an injunction barring the Commonwealth and its political subdivisions from enforcing any statute that "restrict[s] lawfully admitted aliens['] firearms rights and privileges based on citizenship."  Compl. pp. 10-11.

**Argument.**

I.   **PLAINTIFFS' CLAIMS ALL FAIL AS A MATTER OF LAW.**

A.     **The Second Amendment Only Protects United States Citizens.**

Aliens have no rights under the Second Amendment.  The Second Amendment protects

"the right of law-abiding, responsible **<u>citizens</u>** to use arms in defense of hearth and home."

*District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (emphasis added).  The Supreme Court

has held that therefore a total "ban on handgun possession in the home violates the Second

Amendment, as does [a] prohibition against rendering any lawful firearm in the home operable for

the purpose of immediate self-defense." *Id*.  The Court reiterated throughout *Heller*, however, that

the Second Amendment protects a "not unlimited" right belonging to "citizens." *Id*. at 584-85 &

n.8; 595, 602-3, 607-8, 611-14, 616, 618-19, 625-26, 629-30, 635.  This Court "must give this

language great weight," even though *Heller's* careful and repeated statements that the Second

Amendment protects rights held only by "citizens" were dicta. *See United States v. Southern

Union Co.*, 630 F.3d 17, 34 (1st Cir. 2010).  The Court is "bound by the Supreme Court's

considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a

dictum is of recent vintage and not enfeebled by any subsequent statement." *Id*. (quoting *McCoy

v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir.1991)) (internal quotation mark omitted).

*Heller* was extended to the States in *McDonald v. City of Chicago, Illinois*, 130 S.Ct. 3020

(2010).  A four-member plurality reiterated that "citizens" have a right to keep and bear arms (*id*.

at 3036, 3038), and held that the "right to possess a handgun in the home for the purpose of self-

defense" is "fundamental from an American perspective" and thus is incorporated into the Due

Process Clause of the Fourteenth Amendment (*id*. at 3050).  The fifth and deciding vote concluded

that the right recognized in *Heller* "is a privilege of American citizenship that applies to the States

through the Fourteenth Amendment's Privileges or Immunities Clause." *Id*. at 3059 (Thomas, J.,

concurring).  This clause protects "the rights of citizens 'of the United States' . . . including the

right to keep and bear arms." *Id*. at 3068 (quoting Fourteenth Amendment, § 1).

"[T]he Second Amendment right is exercised individually and **<u>belongs to all Americans</u>**."

*Heller*, 554 U.S. at 581.  This follows from the language of the Constitution.  When the Second

Amendment states that "the right of the people to keep and bear Arms, shall not be infringed," the phrase "the people" "unambiguously refers to all members of the political community." *Id*. at 580. This phrase is used as "a term of art" in the Constitution to refer to persons who are "considered part of a national community." *Id*. (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). For example, "[t]he Preamble declares that the Constitution is ordained and established by 'the People of the United States.'" *Verdugo-Urquidez*, 494 U.S. at 265. But aliens, by definition, are not part of the political community. *See, e.g., Foley v. Connelie,* 435 U.S. 291, 295-96 (1978).

The Court's conclusion that only citizens have rights under the Second Amendment also follows from the fact that, at the time the Second Amendment was enacted, "Americans understood" the right to keep arms "as permitting a **citizen** to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Heller*, 554 U.S. at 594-95 (quoting 1 Blackstone's Commentaries 145-146, n. 42 (1803) (emphasis added)). The Second Amendment codified that "pre-existing right." *Heller*, 554 U.S. at 592, 603.

As the First Circuit has noted, "[p]erhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as **a civic right**. Such a right was not something that all persons could claim, but was **limited to** those **members of the polity** who were deemed capable of exercising it in a virtuous manner." *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009 ) (quoting Saul Cornell, *" Don't Know much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) (emphasis added)). "[M]ost scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike' . . . ." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *accord United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010). The Second Amendment reflects the view that "[r]ather than placing full confidence in a standing army filled with aliens, convicts, vagrants, and mercenaries—who do not truly represent the electorate, and who may pursue their own agendas—a sound republic should rely on its own armed citizens-a 'militia' of 'the people'." Akhil Reed Amar, *The Second*

*Amendment: A Case Study in Constitutional Interpretation*, 2001 Utah L. Rev. 889, 892 (2001); *accord Heller*, 554 U.S. at 599-600 (Second Amendment helps protect "the citizens' militia").

In sum, the Second Amendment does not limit the power of either the States or the Federal government to restrict the extent to which aliens may possess or carry firearms.

**B.     The Equal Protection Clause Claim Adds Nothing to the Case.**

**1.     State Laws Giving Aliens Limited Rights to Bear Arms Do Not Violate the Fourteenth Amendment Because They Are Allowed by the Second Amendment.**

The Fourteenth Amendment does not bar States from opting not to grant aliens the same privileges or rights to possess or carry firearms that are held by citizens. As shown above, the right to bear and keep arms that applies to the States through the Fourteenth Amendment under *McDonald* is a right held only by citizens. The four-justice plurality held "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald*, 130 S.Ct. at 3050. The right recognized in *Heller* protects only "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Justice Thomas, as the fifth and deciding vote, similarly concluded that the right recognized in *Heller* applies to the States precisely because it "is a privilege of American citizenship." *McDonald*, 130 S.Ct. at 3059 (Thomas, J., concurring). Plaintiffs' invocation of the Equal Protection Clause does not give rise to any broader claim.

Because the Second Amendment allows States to treat aliens differently with respect to keeping or bearing arms, State laws that do so cannot violate the constitutional requirements of equal protection. In another constitutional context, the Supreme Court has held that in the unusual circumstances where a provision of the United States Constitution reserves to the States the power to discriminate against a particular class of persons for a particular purpose, State laws that do so will neither implicate nor violate the Equal Protection Clause. *See Richardson v. Ramirez*, 418 U.S. 24, 54-55 (1974). At issue in *Richardson* were California laws that barred felons from voting even after they completed their prison sentence and parole. *Id*. at 26-27. Plaintiffs claimed that depriving such persons of their fundamental right to vote did not serve a "compelling state interest" and thus violated the Equal Protection Clause. *Id*. at 33, 54.

The Supreme Court held that the Equal Protection Clause was not implicated in *Richardson* because "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment" and thus as a general matter felon disenfranchisement laws do not violate equal protection. *Id*. at 54-56.  As the First Circuit has explained in discussing *Richardson*, "Section 2 concerns the abridgement of the right to vote at any election for 'President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or members of the Legislature.'" *Simmons v. Galvin*, 575 F.3d 24, 32 (1st Cir. 2009), *cert. denied*, 131 S.Ct. 412 (2010) (quoting U.S. Const. amend. XIV, § 2).  Section 2 "provides for the denial by states of the right to vote to persons 'for participation in rebellion, or other crime,'" without suffering any reduction in their representation in Congress. *Id*.  In contrast, if a State bars otherwise eligible voters for some other reason, that will reduce the number of residents taken into account when apportioning seats in the House of Representatives.[5]  "Thus, the state's denial of the right to vote to felons has a constitutional grounding." *Simmons*, 575 F.3d at 32.  There is an important except to *Richardson*:  "[i]f a state enacts a law which disenfranchises felons 'with the intent of disenfranchising blacks,' that state has run afoul of § 1 of the Fourteenth Amendment." *Id*. (quoting *Hunter v. Underwood*, 471 U.S. 222, 229 (1985)).  But plaintiffs in this case make no claim that the Massachusetts firearms licensing laws were intended to discriminate on the basis of race, or adopted for any purpose other than regulating the possession and carrying of firearms. Thus, as a matter of law, plaintiffs cannot succeed on their claim that the Massachusetts firearms licensing statutes implicate the Equal Protection Clause merely because they treat aliens differently than citizens.

---

[5]      Section 2 of the Fourteenth Amendment reads as follows (emphasis added): "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.  But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, **except for participation in rebellion, or other crime**, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

The logic of *Richardson* applies with full force here.  By limiting governmental power to regulate possession of firearms by United States citizens, but not imposing any similar limitation on regulating gun possession by non-citizens, the Second Amendment provides an "affirmative sanction" and "constitutional grounding" for laws that allow citizens to exercise their not unlimited right to bear arms but that restrict the ability of aliens to possess and carry guns. Therefore, just as in *Richardson*, the Equal Protection Clause is not implicated or violated by State laws that treat aliens in a manner contemplated by the Second Amendment.

> **2.      Even If In Theory the Equal Protection Clause Was Implicated, the Challenged Provisions Would Satisfy Equal Protection Because They Have a Rational Basis.**

>> **a.      Alienage Is Not a Suspect Classification In These Unusual Circumstances.**

Although alienage is a suspect classification in many if not most circumstances, under some circumstances—including those in this case—such a classification is not suspect and thus is subject only to rational basis review.  Because the constitutional right to bear arms is a right of citizenship, there is nothing inherently suspect about limiting the extent to which aliens may possess and carry guns.  As the First Circuit has noted, the right protected by the Second Amendment has long been understood to be "a civic right" that applies only to "members of the polity" who are "deemed capable of exercising it in a virtuous manner."  *Rene E.*, 583 F.3d at 15. It is a right of citizenship that is typically forfeited by felons, just as most states bar felons from voting at least while they are incarcerated.  *See, e.g., United States v. Sonczalla*, 561 F.3d 842, 843-44 (8th Cir. 2009); *United States v. Shazier*, 179 F.3d 1317, 1318-19 (11th Cir. 1999); *United States v. McBride*, 938 F.2d 533, 535 (4th Cir. 1991).  Like most States, Massachusetts disqualifies felons both from voting while incarcerated and from possessing a firearm.[6]

"It would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of 'strict scrutiny,' because to do so would 'obliterate all the distinctions between

---

[6]      *See* Mass. Const., amd. art. 3, as amended by amd. art. 120, and Mass. Gen. L. c. 51, § 1, as amended by Mass. St. 2001, c. 150 (disqualifying incarcerated felons from voting), *and* Mass. Gen. L. c. 140, § 129B(1)(i) & (ii), & § 131(d)(i) (disqualifying felons from obtaining FID cards or licenses to carry firearms).

citizens and aliens, and thus depreciate the historic values of citizenship.'" *Foley*, 435 U.S. at 295.
"The fact that all persons, aliens and citizens alike, are protected by the" Fifth and Fourteenth
Amendments "does not lead to the further conclusion that all aliens are entitled to enjoy all the
advantages of citizenship. . . .  For a host of constitutional and statutory provisions rest on the
premise that a legitimate distinction between citizens and aliens may justify attributes and benefits
for one class not accorded to the other. . . ." *Mathews v. Diaz*, 426 U.S. 67, 78-79 (1976)
(affirming federal law excluding aliens from Medicare eligibility unless they have resided in the
United States for at least five years and been admitted for permanent residence).

For example, "it is clear that a State may deny aliens the right to vote, or to run for elective
office, for these lie at the heart of our political institutions." *Foley*, 435 U.S. at 296.  Similarly,
"[s]ome public positions are so closely bound up with the formulation and implementation of self-
government that the State is permitted to exclude from those positions persons outside the political
community . . . ." *Bernal v. Fainter*, 467 U.S. 216, 221 (1984).  Such classifications are
reasonable, not inherently suspect, in a democracy.

> The exclusion of aliens from basic governmental processes is not a deficiency in the
> democratic system but a necessary consequence of the community's process of political
> self-definition.  Self-government, whether direct or through representatives, begins by
> defining the scope of the community of the governed and thus of the governors as well:
> Aliens are by definition those outside of this community.

*Id.*, quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 439-40 (1982).

The Supreme Court has therefore "lowered [its] standard of review when evaluating the
validity of exclusions that entrust only to citizens important elective and nonelective positions
whose operations 'go to the heart of representative government.'" *Gregory v. Ashcroft*, 501 U.S.
452, 463 (1991) (quoting *Bernal*, 467 U.S. at 221).  It has upheld, on rational basis review, state
laws that bar some or all aliens from public positions of particular importance.  See *Foley* (state
police); *Cabell* (probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (State may bar aliens
who have not declared their intent to become citizens from teaching in the public schools).
Similarly, a state law requiring "that jurors speak and understand English and that a jury be
composed wholly of citizens of the United States" is only subject to rational basis review under

the Equal Protection Clause, and easily passes muster. *Commonwealth v. Acen*, 396 Mass. 472, 481-82 (1986); *see also Carter v. Jury Comm'n of Greene County*, 396 U.S. 320, 332 (1970) ("States remain free to confine the selection [of jurors] to citizens") (dictum).

For much the same reasons, only rational basis review would apply if the Equal Protection Clause were implicated here. The Second Amendment protects a civic right shared by most citizens but not shared by aliens. Under these unusual circumstances, a classification based on alienage is not inherently suspect, as a matter of constitutional law.

**b.      Heightened Scrutiny Is Also Not Warranted on a "Fundamental Rights" Theory.**

Furthermore, any claim that the Equal Protection Clause requires strict scrutiny because the Second Amendment secures a fundamental right would be without merit, as a matter of law. Even if plaintiffs had a viable Second Amendment claim, which they do not, the Massachusetts firearms licensing statutes would still not be subject to anything more stringent than rational basis review under the Equal Protection Clause. *See Nordyke v. King*, 2011 WL 1632063, *14 (9th Cir. 2011). It would be surpassing strange to subject the Massachusetts firearm licensing laws to strict scrutiny under the Equal Protection Clause when they would be subject at most to intermediate scrutiny under the Second Amendment, even assuming that the Second Amendment applied to aliens and that plaintiffs were seeking to vindicate a right actually protected by the Second Amendment. *See United States v. Masciandaro*, 2011 WL 1053618, *9, *11-*12 (4th Cir. 2011) (applying intermediate scrutiny to firearm rules that apply to law-abiding citizens). "[A] strict scrutiny standard of review would not square with the [Supreme Court's] references to 'presumptively lawful regulatory measures' such as laws prohibiting firearms possession by felons and the mentally ill. . . ." *Heller v. District of Columbia*, 698 F.Supp.2d 179, 188 (D.D.C. 2010) ("*Heller II*") (upholding new District of Columbia firearm licensing ordinance passed after Supreme Court decision), appeal pending, No. 10-7036 (D.C. Cir.).[7]

_____

[7]      "As examples of 'longstanding' restrictions that were [and are] 'presumptively lawful' under the Second Amendment, the Court listed:  (1) laws prohibiting the carrying of concealed weapons, (2) laws prohibiting the possession of firearms by felons and the mentally ill, (3) laws prohibiting the carrying of firearms 'in sensitive places such as schools and government

Where a provision of the Bill of Rights is incorporated into the Fourteenth Amendment and thus is applicable to the States, the Equal Protection Clause does not "erect a separate and distinct framework for analyzing claims" that the right protected by the Bill of Rights has been violated. *Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 354 (1st Cir. 2004) (rejecting claim that Equal Protection Clause protects free exercise of religion more broadly than does the Free Exercise Clause of the First Amendment); *accord Nordyke*, 2011 WL 1632063, *14 (same re claimed infringement of right to keep and bear arms). To the contrary, the scope of the constitutional right is determined by the Bill of Rights provision, and "rational basis scrutiny applies to any further equal protection inquiry." *Eulitt*, 386 F.3d at 354; *accord, e.g., Nordyke*, 2011 WL 1632063, *14 (right to bear arms claim); *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (free exercise claim); *Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005), *cert. denied*, 546 U.S. 1150 (2006) (same); *McGuire v. Reilly*, 260 F.3d 36, 49-50 (1st Cir. 2001) (free speech claim). That a constitutional right is deemed sufficiently important to be incorporated into the

---

buildings,' (4) laws imposing conditions and qualifications on the commercial sale of arms, and (5) laws prohibiting the carrying of 'dangerous and unusual weapons.'" *Rene E.*, 583 F.3d at 12 (quoting *Heller*, 554 U.S. at 626-27 & n.26). This "list does not purport to be exhaustive." *Id.* (quoting *Heller*, n.26). The Court "repeat[ed] those assurances" in *McDonald*, and stressed that applying the Second Amendment to the States "does not imperil every law regulating firearms." *McDonald*, 130 S.Ct. at 3047 (plurality). "[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id.* at 3046 (plurality).

The kind of categorical disqualifications that the Supreme Court cites approvingly in *Heller* and *McDonald* apply with equal force inside the home, and laws barring felons, mentally ill persons, and other irresponsible persons from keeping a handgun in their home are not subject to strict scrutiny under the Second Amendment. *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (intermediate scrutiny applies to federal statute barring possession of firearms while under domestic violence protection order); *United States v. Williams*, 616 F.3d 685, 692-93 (7th Cir. 2010) (intermediate scrutiny applies to federal statute barring felons from possessing firearms); *see also, e.g., United States v. Barton*, 633 F.3d 168, 174-75 (3d Cir. 2011) (felons have no Second Amendment right to possess firearms for self-defense in their home); *Rene E.* 583 F.3d at 12 (complete ban on juvenile possession of handguns does not implicate Second Amendment).

The clear consensus is that intermediate scrutiny—but not strict scrutiny—is appropriate where the Second Amendment is implicated. *Id.*; *see also United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) (statute barring anyone convicted of a domestic violence misdemeanor from possessing a gun); *United States v. Marzzarella*, 614 F.3d 85, 97-98 (3d Cir. 2010) (statute barring possession of unmarked firearm, even in one's home); *Heller II*, 698 F.Supp.2d at 188; *cf. Masciandaro*, 2011 WL 1053618, *11-*12 (4th Cir.) (statute barring possession of loaded firearm in national park).

Fourteenth Amendment's Due Process Clause does not mean that a classification alleged to infringe that right is subject to "a standard of scrutiny stricter than the traditional rational-basis test" under the Equal Protection Clause. *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974).

So long as the challenged classification comports with the provision incorporated from the Bill of Rights, it does not interfere with a fundamental right and thus will also satisfy the requirements of equal protection so long as it has some rational basis. *Eulitt*, 386 F.3d at 354; *McGuire*, 260 F.3d at 49-50; *see also Wirzburger*, 412 F.3d at 282-83.

### c.      The Challenged Statutory Provisions Have a Rational Basis.

The Massachusetts statutes that allow aliens to possess and carry only regular capacity rifles and shotguns have a rational basis. "A statute passes the rational basis test 'if any reasonably conceivable set of facts could establish a rational relationship between [it] and the . . . government's legitimate ends.'" *Gun Owners Action League, Inc. v. Swift*, 284 F.3d 198, 213-14 (1st Cir. 2002) (quoting *Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs*, 876 F.2d 1013, 1021 (1st Cir.1989)). "As long as this modest burden is satisfied, [the Legislature's] handiwork will endure 'even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.'" *Boivin v. Black*, 225 F.3d 36, 43-44 (1st Cir. 2000) (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)). "Rationality review in equal protection cases 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id*. (quoting *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003) (quoting *Beach Communications*, 508 U.S. at 315). Where the rational basis test applies and a statute has a rational basis, a challenge to the statute under the Equal Protection Clause must be dismissed. *See Gun Owners' Action League*, 284 F.3d at 213-15.

Especially in this day and age, there is nothing irrational about a statutory scheme that disqualifies non-citizens from possessing or carrying large-capacity rifles or shotguns or easily concealable handguns and other firearms, while allowing them to apply for a permit to possess and carry regular rifles and shotguns. Since the constitutional right to keep and bear arms is a "civic

right" held only by "law-abiding, responsible citizens," *see Rene E.*, 583 F.3d at 15, and *Heller*, 554 U.S. at 635, it would have been perfectly rational for the Massachusetts legislature to determine that only citizens who meet the other licensing requirements should be trusted with a large capacity, concealed, or concealable firearm.  An alien, even a resident alien, "withhold[s] his allegiance from the United States" and "leaves outstanding a foreign call on his loyalties." *Harisiades v. Shaughnessy*, 342 U.S. 580, 585-586 (1952).  It is undoubtedly true that "the presumption that all aliens owe no allegiance to the United States is not valid in every case." *United States v. Gordon-Nikkar*, 518 F.2d 972, 977 (5th Cir. 1975) (quoting *Perkins v. Smith*, 370 F.Supp. 134, 138 (D.Md. 1974), *aff'd*, 426 U.S. 913 (1976)) (holding that exclusion of aliens from jury venires did not violate defendant's Sixth Amendment rights).  But "the fact that legislation may be overinclusive or underinclusive with regard to its goal does not signify that a rational relationship is lacking."  *Baker v. Concord*, 916 F.2d 744, 755 (1st Cir. 1990).

## II.   AT THE VERY LEAST, PLAINTIFFS' CLAIMS THAT THE CHALLENGED STATUTORY PROVISIONS ARE UNCONSTITUTIONAL ON THEIR FACE MUST BE DISMISSED.

Even if Fletcher and Pryal had stated a viable claim that the statutory restrictions on aliens' eligibility to possess or carry firearms are unconstitutional as applied to them, which they have not for the reasons stated above, the Court should still dismiss the much broader claims that the challenged provisions are unconstitutional on their face.  "Facial challenges are disfavored," *Washington State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008), and plaintiffs "cannot meet [their] heavy burden of proving there are no circumstances under which those laws could be valid."  *See McCullen v. Coakley*, 571 F.3d 167, 174 (1st Cir. 2009).  "[A] party who mounts a facial challenge to a state statute" faces "a very heavy burden." *Id*.  Such a claim "will fail if a statute 'has a plainly legitimate sweep.'"  *Id*. (quoting *Washington State Grange*, 552 U.S. at 449).  Plaintiffs' facial claims fail because they cannot "establish that no set of circumstances exists under which" the statutory disqualification of aliens "would be valid." *Id*. (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

### A.      The Second Amendment Does Not Apply Outside the Home, to Large-Capacity Weapons, or to the Carrying of a Concealed Firearm in Public.

By asking the Court to hold that the statutory disqualifications on aliens obtaining Class A and Class B licenses to carry are unconstitutional on their face, plaintiffs are asking the Court to hold that there is a Second Amendment right to carry to carry guns outside the home and that this includes the right to carry large-capacity weapons and to carry concealed weapons.  But, even if the Second Amendment were to protect rights of non-citizens (which it does not), the Second Amendment does not mandate that anyone (citizens or non-citizens) be granted the full panoply of permissions that are available through unrestricted licenses to carry in Massachusetts.  Plaintiffs' claim of facial invalidity therefore fails as a matter of law.

"[T]he right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. "It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *McDonald*, 130 S.Ct. at 3047 (plurality) (quoting *Heller*, 554 U.S. at 626).  The Court does "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation. . . ." *Heller*, 554 U.S. at 595 (emphasis in original).

Neither *Heller* nor *McDonald* holds that the Second Amendment protects any right to carry arms outside the home.  *See United States v. Masciandaro*, 2011 WL 1053618, *9, *16-*17 (4th Cir. 2011).  To the contrary, the Supreme Court made clear that "'the need for defense of self, family, and property is most acute' in the home," *McDonald*, 130 S.Ct. at 3036 (majority) (quoting *Heller*, 554 U.S. at 628), and held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. "[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Masciandaro* at *12 (citing *Heller* at 626).  The Court should hesitate to extend the Supreme Court's Second Amendment jurisprudence in the manner suggested by plaintiffs' complaint.  As the Fourth Circuit warns:

> This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we

> miscalculated as to Second Amendment rights.   It is not far-fetched to think the *Heller*
> Court wished to leave open the possibility that such a danger would rise exponentially as
> one moved the right from the home to the public square.

*Id.* at *17.  If the Second Amendment does not protect any right to carry weapons outside one's

home, than it could not require the issuance of an unrestricted Class A or Class B license.  The

Court need not decide this issue, however, because plaintiffs' facial challenge under the Second

Amendment would fail in any case.  *See id.*

Even if the constitutional right to bear arms extended outside the home, plaintiffs would

still have no constitutional right to carry the kind of large-capacity guns covered by an unrestricted

Class A license, like the Glock 19 with a 33-round extended magazine used to attack

Congresswoman Giffords and others in Tucson, Arizona.[8]  "[T]he Second Amendment does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes."

*Heller*, 554 U.S. at 625.  It only protects the sorts of weapons "in common use at the time" the

amendment was enacted, *id.* at 625 & 627 (quoting *United States v. Miller*, 307 U.S. 174 (1939)),

and thus does not limit the States' power to prohibit possession of high-capacity weapons such as

"M-16 rifles and the like" or other "dangerous and unusual" weapons, *id.* at 627  Because firearms

with "large capacity ammunition feeding devices" are typically not needed for lawful purposes,

were not in common use in the eighteenth century, and are unusually dangerous, the Second

Amendment does not protect possession or carrying of such weapons.  *Heller v. District of*

*Columbia*, 698 F.Supp.2d 179, 193-95 (D.D.C. 2010) ("*Heller II*") (upholding new District of

Columbia firearm licensing ordinance passed after Supreme Court decision), appeal pending, No.

10-7036 (D.C. Cir.); *accord United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008), *cert.*

*denied*, 129 S.Ct. 1369 (2009) (same for machine guns).

Nor do Fletcher or Pryal have any constitutional right to carry a concealed weapon in

public.  *Rene E.*, 583 F.3d at 12; *Dorr v. Weber*, 741 F.Supp.2d 993, 1004-5 (N.D. Iowa 2010)

(because Second Amendment creates no right to carry concealed weapon, denial of permit for

concealed weapon could not violate Second Amendment); *see also Heller*, 554 U.S. at 626 (noting

---

[8]   *See, e.g.,* http://www.businessweek.com/magazine/content/11_04/b4212052185280.htm
(last visited May 16, 2011).

with approval that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"); *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) ("the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons.") (dictum); *United States v. Hart*, 726 F.Supp.2d 56, 60 (D.Mass. 2010) (Young, J.) (investigatory stop on suspicion of carrying concealed weapon did not violate Second Amendment).

For these reasons, the claim that the challenged statutory provisions violate the Second Amendment on their face must be dismissed under Rule 12(b)(6).

**B.      Even If the Equal Protection Clause Gave Permanent Resident Aliens Some Right to Bear Arms, Neither Illegal Aliens Nor Non-Citizens Allowed to Enter the United States Only Temporarily Would Have Any Such Right.**

Plaintiffs seem to concede that the challenged statutory provisions do not violate the Equal Protection Clause on their face, because plaintiffs only ask that the Court grant relief with respect to application of the eligibility restrictions to "lawfully admitted aliens." Compl. p. 11. Plaintiffs are right to concede that applying the eligibility restrictions to illegal aliens would not violate equal protection. "Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982). Furthermore, Congress has made it a federal crime for illegal aliens to possess, receive, or transport firearms or ammunition within the United States. *See* 18 U.S.C. § 922(g)(5)(A); *see generally, e.g., United States v. Mousli*, 511 F.3d 7 (1st Cir. 2007) (applying statute). Courts that have addressed the issue since *Heller* have upheld this federal statute against constitutional challenge on the ground "that illegal aliens are not only disqualified from the exercise of Second Amendment rights by § 922(g)(5), but do not have rights under the Second Amendment in the first place because they are not among 'the people' contemplated by the Second Amendment." *United States v. Lewis*, 2010 WL 3370754, *3, *report and recommendation adopted*, 2010 WL 3370719 (N.D. Ga. 2010) (discussing cases).

Especially where Congress has made it unlawful for illegal aliens to possess or carry firearms as a matter of federal law, it cannot violate equal protection for Massachusetts to follow

that lead and adopt similar restrictions as a matter of state law. "[I]f the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction." *Plyler*, 457 U.S. at 219 n.19; *accord DeCanas v. Bica*, 424 U.S. 351 (1976) (upholding California law barring employment of illegal aliens if it "would have an adverse effect on lawful resident workers").

Nor would it violate equal protection for Massachusetts to limit the kinds of guns that may be carried or possessed by temporary or nonimmigrant aliens. State laws that bar such aliens—who are lawfully present in the United States but only on a temporary basis—from particular benefits that are available to otherwise eligible citizens and permanent aliens are subject to rational basis review, and satisfy the requirements of equal protection, at least in part because Congress has determined that temporary or nonimmigrant aliens may be denied federal welfare benefits and other legal advantages available only to citizens and permanent aliens. *See, e.g., League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007) (applying rational basis review to and upholding Tennessee law that conditions issuance of driver license on proof of United States citizenship or lawful permanent resident status, and provides that temporary resident aliens may only receive a temporary certificate for driving that is not valid for identification); *LeClerc v. Webb*, 419 F.3d 405, 415-22 (5th Cir. 2005), *reh'g en banc denied*, 444 F.3d 428 (5th Cir. 2006), *cert. denied*, 551 U.S. 1158 (2007) (applying rational basis review to and upholding Louisiana law that only allows U.S. citizens and lawful resident aliens to seek admission to state Bar, and bars nonimmigrant aliens from doing so).

In sum, because the statutory disqualification of aliens from obtaining licenses to carry or FID cards comports with equal protection in many (if not all) circumstances, the challenged provisions cannot violate the Equal Protection Clause on their face. *See, e.g., Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 12 (1st Cir.2005) (en banc) (affirming dismissal of facial challenge to provisions of the Massachusetts Racial Imbalance Act, on ground that there were circumstances in which the Act would be valid), *abrogated on other grounds, Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007).

### III.   THE TWO CORPORATE PLAINTIFFS LACK STANDING.

Plaintiffs Second Amendment Foundation, Inc. ("SAF") and Commonwealth Second
Amendment, Inc. ("C2A") must demonstrate that they have associational or representational
standing, as neither corporation alleges that it has applied or could apply for a firearm license or
identification card in Massachusetts.  An association "may sue based on injuries to its members'
interests only if (1) at least one of its members would have standing to sue as an individual, (2)
'the interests at stake are germane to the organization's purpose,' and (3) individual members'
participation is not necessary to either the claim asserted or the relief requested." *Animal Welfare
Institute v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw
Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  SAF and C2A lack standing because they do
not satisfy the first of these requirements.  The Court therefore has no jurisdiction to consider their
claims.  *See, e.g., United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992) ("Standing is a
constitutional precondition to the jurisdiction of a federal court").

SAF does not identify any member who tried but failed to obtain a Massachusetts firearms
license because she is an alien; it does not allege that Fletcher or Pryal is a member.  Instead, SAF
claims only that its members include "lawfully admitted aliens residing in the Commonwealth."
Compl. ¶ 4.  This sort of "general allegation" of potential injury to some members, without
identifying any particular members who have themselves suffered a "concrete injury," is
insufficient as a matter of law to establish associational standing.  *AVX Corp.*, 962 F.2d at 117.  To
have standing, SAF would have to demonstrate that one or more of its members faces "actual or
imminent" injury from the Massachusetts laws disqualifying aliens from possessing most kinds of
guns. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-64 (1992).  The mere possibility that
someday an SAF member who is a lawful resident alien domiciled in Massachusetts may seek a
firearm license from the Commonwealth is not sufficient to give SAF standing. *Id.* at 563-64.

Because C2A has no members, it is even further away from establishing associational
standing.  C2A alleges that it is a corporation, that it is "currently seeking a determination of
26 U.S.C. § 501(c)(3) non-profit status from the Internal Revenue Service," and that its
"supporters . . . include many lawfully admitted aliens residing in the Commonwealth."  Compl.

¶ 5.  An organization that neither has members nor functions like a membership organization cannot have associational standing to protect purported interests of "alleged supporters."  *Fund Democracy, LLC v. Securities and Exchange Comm'n*, 278 F.3d 21, 26 (D.C. Cir. 2002).

### Conclusion.

The Second Amendment allows the Commonwealth of Massachusetts to treat citizens and non-citizens differently in granting firearms licenses.  For this reason, the Massachusetts statutory scheme that allows non-citizens to seek a permit to possess and carry regular capacity rifles and shotguns, but does not allow them to join otherwise qualified citizens in seeking a license to carry large-capacity or concealed weapons, does not violate either the Second Amendment or the Equal Protection Clause.  Even if Fletcher and Pryal in theory could claim that this statutory treatment of aliens is unconstitutional as applied to them, they cannot meet their heavy burden of proving that these laws are unconstitutional on their face.  Finally, neither the Second Amendment Foundation nor Commonwealth Second Amendment, Inc., has standing to press these claims.  For all these reasons, the Court should dismiss this action.

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

  /s/ Kenneth W. Salinger   .
Kenneth W. Salinger (BBO # 556967)
Assistant Attorney General, Government Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617.963.2075
ken.salinger@state.ma.us

May 19, 2011

### Certificate of Service
I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF as non registered participants on or before May 19, 2011.

  /s/ Kenneth W. Salinger   .