UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTOPHER M. FLETCHER, et al., | ) | |
| | ) | Civil Action No. 1:11-CV-10644-DPW |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ROBERT C. HAAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT
JASON A. GUIDA'S, DEFENDANT ROBERT C. HAAS' AND DEFENDANT MARK K.
LEAHY'S MOTIONS TO DISMISS

REQUEST FOR ORAL ARGUMENT

Come now the plaintiffs, Christopher M. Fletcher, Eoin M. Pryal, Second Amendment

Foundation, Inc., and Commonwealth Second Amendment, Inc., by and through undersigned

counsel, and submit their memorandum of points and authorities in opposition to defendant Jason

A. Guida's, defendant Robert C. Haas', and defendant Mark K. Leahy's motions to dismiss.

Respectfully submitted,

Christopher M. Fletcher, Eoin M. Pryal, Second
Amendment Foundation, Inc., and Commonwealth
Second Amendment, Inc.
By their attorney,

Dated: June 10, 2011          /s/ Joseph M. Hickson III
                             Joseph M. Hickson III
                             Hickson Law Group, P.C.
                             51 Taylor Street, 3rd Floor
                             Springfield, MA 01103
                             Phone: 413.732.7708
                             Fax: 413.375.9888
                             BBO # 665687
                             Email: jhickson@HicksonLawGroup.com

## TABLE OF CONTENTS

INTRODUCTION & SUMMARY OF ARGUMENT ..................................................................... 1

LEGAL & FACTUAL BACKGROUND ..................................................................................... 2

STANDARD OF REVIEW ........................................................................................................... 3

ARGUMENT ................................................................................................................................. 3

    I.   The Plaintiffs Are Entitled To Relief on Three Separate and Distinct Grounds. ............... 3

        A.  The Second Amendment Protects Lawfully Admitted Aliens. ...................................... 3

        B.  State Law Limiting Firearms Rights Based On Alienage Violate the Plaintiffs' Equal Protection Rights. ........................................................................................... 7

            1.  State Law Limiting Firearms Rights Based On Alienage Are Subject to Strict Scrutiny. ................................................................................................. 7

            2.  No Exceptions Apply To The Application of Strict Scrutiny to the Commonwealth's Alienage Based Discrimination. ............................................... 8

            3.  Strict Scrutiny Is Separately Warranted On A "Fundamental Rights" Theory. ................................................................................................................. 10

        C.  State Law Limiting Firearms Rights Based On Alienage Fail To Satisfy Any Level of Scrutiny. .......................................................................................... 13

        D.  State Law Limiting Firearms Rights Based On Alienage Are Further Unconstitutional Because They Interfere With The Exclusive Federal Right to Regulate Immigration and Naturalization. ............................................................. 15

    II.  The Challenged Statutory Provisions Are Facially Invalid ............................................. 16

        A.  Although a License to Carry May Permit Allegedly Non Protected Conduct Under The Second Amendment, Those Laws Remain Facially Invalid. .................... 17

        B.  Illegal Aliens and Lawfully Admitted Aliens Who Do Not Establish Residence in the Commonwealth Do Not Impact This Facial Invalidity. .................. 17

    III. Each Corporate Plaintiff Has Established Standing. ........................................................ 18

    IV. If Necessary, Plaintiffs Respectfully Request An Opportunity To Amend the Complaint. ....................................................................................................................... 19

CONCLUSION ........................................................................................................................... 19

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT
JASON A. GUIDA'S, DEFENDANT ROBERT C. HAAS' AND DEFENDANT MARK K.
LEAHY'S MOTIONS TO DISMISS

## INTRODUCTION & SUMMARY OF ARGUMENT

The defendants' motions to dismiss should be denied, as the plaintiffs have alleged facts

sufficient to establish both their right to relief and standing to claim such relief. The plaintiffs are

entitled to relief on three separate and distinct grounds.

*First*, the Second Amendment protects lawfully admitted aliens residing in the

Commonwealth (*see* pages 3-7). *Second*, Commonwealth laws limiting Second Amendment

rights based on alienage violate the plaintiffs' Equal Protection rights under the Fourteenth

Amendment. These laws are subject to strict scrutiny under this Equal Protection analysis

because the defendants are discriminating against a suspect class (pp.7-8) and no exception

applies to the application of this level of scrutiny (pp. 8-10). This level of scrutiny is separately

warranted because the defendants are inhibiting a core fundamental right (pp. 10-13). Further,

these laws fail to satisfy any level of scrutiny (pp. 13-14). *Third*, Commonwealth laws limiting

Second Amendment rights based on alienage comprise an unconstitutional inference with the

exclusive federal right to regulate immigration and naturalization (pp. 14-15).

Further, the plaintiffs have alleged facts sufficient to establish a facial challenge to the

subject laws, as these discriminatory laws have no plain legitimate sweep (pp. 15-17).

Finally, each corporate plaintiff has alleged facts sufficient to establish standing as the

interests at stake in this matter are germane to its purpose and members and supporters of these

organizations have standing to sue as individuals, but their participation is not necessary to this

matter (pp. 18-19).

Therefore, each defendant's individual motion to dismiss must be denied.

## LEGAL & FACTUAL BACKGROUND

Plaintiff's Christopher M. Fletcher ("Dr. Fletcher") and Eoin M. Pryal ("Mr. Pryal") emigrated from the United Kingdom to the United States and permanently reside in the Commonwealth. Dr. Fletcher resides in Cambridge, Massachusetts. Mr. Pryal resides in Northborough, Massachusetts. Both individual Plaintiffs are lawfully admitted permanent resident aliens and reside in the Commonwealth. Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization, with a membership that includes lawfully admitted aliens residing in the Commonwealth. Plaintiff Commonwealth Second Amendment, Inc. ("C2A") is a Massachusetts corporation with pending non-profit status, with supporter-base that includes lawfully admitted aliens residing in the Commonwealth. The purposes of both institutional plaintiffs include education, research, publishing and legal action focusing on the Constitutional right privately to own and possess firearms. SAF and C2A respectively bring this action on behalf of themselves and their members and supporters.

Between late 2010 and early 2011, Dr. Fletcher and Mr. Pryal attempted to apply to their local police chief/commissioner for Licenses to Carry. Both men satisfied all licensing requirements, with the exception of United States citizenship. Both men had many compelling reasons to apply for a License to Carry,[1] but the principal reason each applied for a License to Carry was to obtain the ability to possess firearms, namely a handgun, for immediate self-defense in their individual homes. Both men were summarily denied by their respective police departments and told that their applications would not be accepted.

Dr. Fletcher and Mr. Pryal were separately directed by their police departments to apply for a Massachusetts Resident Alien Permits through the Firearms Record Bureau. If granted, a

---

[1] "License to Carry" is a misnomer, as only an unrestricted subset of the LTC A, namely LTC A ALP (All Lawful Purposes), permits the right to conceal carry. Mass. Gen. L. c. 140, § 130.

Massachusetts Resident Alien Permit would only allow Dr. Fletcher and Mr. Pryal to possess a small subset of rifles and shotguns. Holders of Massachusetts Resident Alien Permits are not permitted to purchase, possess, or carry a handgun, even in their home. Further, holders of Massachusetts Resident Alien Permits are not permitted to purchase any firearms (including rifles and shotguns) or ammunition in the Commonwealth.

## STANDARD OF REVIEW

In order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007). In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. *Nollet v. Justices of the Trial Court of Mass.*, 83 F. Supp. 2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000). Furthermore, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. *See Nollet*, 83 F. Supp. 2d at 208.

## ARGUMENT

I.      **The Plaintiffs Are Entitled To Relief on Three Separate and Distinct Grounds.**

A.      **The Second Amendment Protects Lawfully Admitted Aliens.**

Lawfully admitted aliens residing in the Commonwealth are protected by the same Second Amendment rights as United States citizens residing in the Commonwealth. The Second Amendment protects "the right of the **people** to keep and bear Arms." While the defendants heavily rely on the use of the term "citizen" in both *District of Columbia v. Heller*, 554 U.S. 570

(U.S. 2008) and *McDonald v. City of Chicago, Illinois*, 130 S.Ct. 3020 (2010), they are mistaken that either of those decisions contains any "statemen[t] that the Second Amendment protects rights held **only** by 'citizens.'" Def. Guida Br. p. 5 (emphasis added). The Second Amendment's use of "people" avoids a binary citizen versus non-citizen segregation of rights, and the Court's use of "citizen" in Second Amendment matters does not modify this intent.

In *Heller*, the majority opinion only employed the term "citizen" to distinguish the Second Amendment as an individual right from a collective right.[2] This use is solidified by the Court's explicit definition of the classes of individuals protected by the Second Amendment: "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The Court further defines these "members of the political community," protected by the First, Second, Fourth, Ninth and Tenth Amendments, as those "who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. The defendant in *Verdugo-Urquidez* was a citizen resident of Mexico with no connection to the United States beyond smuggling marijuana across the United States-Mexico border. 494 U.S. at 262-263. The plaintiffs in this matter are clearly a part of the national community and have developed extensive connections with this country, including but not limited to obtaining employment, paying taxes, and residing in the Commonwealth.

Lawfully admitted aliens are unquestionably part of United States' national community and have developed sufficient connection with this country. "[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all

---

[2] "If we look to other founding-era documents, we find that some state constitutions used the term 'the people' to refer to the people collectively, in contrast to 'citizen,' which was used to invoke individual rights." *Heller*, 554 U.S. at 580 n.6.

people within our borders." *Bridges v. Wixon*, 326 U.S. 135, 161 (U.S. 1945) (concurring opinion).[3] The Court has repeatedly found lawfully admitted aliens to be the specific type of "people" envisioned in the Bill of Rights. *See, e. g., Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens entitled to First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The *Fifth Amendment*, as well as the *Fourteenth Amendment*, protects every one of these persons . . ."). Further, "an alien as well as a citizen is a 'person' for equal protection purposes." Graham v. Richardson, 403 U.S. 365, 375 (U.S. 1971). *See also Plyler v. Doe*, 457 U.S. 202, 211-212 (1982); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886); *Mohamed v. Parks*, 352 F. Supp. 518, 520 (D. Mass. 1973) ("An alien's constitutional right to equal protection cannot be made to depend upon the rejected concept that government benefits were a privilege, not a right, especially since resident aliens are subject to the same obligations as citizens, such as military service.").

The defendants' use of *United States v. Rene E.*, is further misplaced, as the First Circuit was addressing age, not citizenship, and concluded that there is "longstanding practice of prohibiting certain classes of individuals from possessing firearms -- *those whose possession poses a particular danger to the public*." 583 F.3d 8, 15 (1st Cir. Me. 2009). Although the

---

[3] "Thomas Jefferson said, '[The] best principles [of our republic] secure to all its citizens a perfect equality of rights.' Millions of immigrants have come to America to have these rights. The Constitution and the Bill of Rights give many of these rights to all people living in the United States. These rights include the freedom of expression, of religion, of speech, **and the right to bear arms**. All people living in the United States also have many of the same duties as citizens, such as paying taxes and obeying the laws." U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Citizenship, *Learn About the United States: Quick Civics Lessons for the Naturalization Test*, Washington, DC, 2011, *available at* http://www.uscis.gov/USCIS/Office of Citizenship/Citizenship Resource Center Site/Publications/PDFs/M-638 red.pdf (emphasis added).

defendants have attempted to group the individual plaintiffs into a class including convicts, vagrants, foreign enemies, minors, and mercenaries, they offer no reason to suggest that lawfully admitted aliens present a clear and present danger to the United States, or its inhabitants, beyond those already granted Licenses to Carry by the Commonwealth.[4] Nativist theories that lawfully admitted aliens present a salient public danger have been historically based on irrational fear and prejudice against immigrants.[5]

Finally, there is no affirmative sanction in the Second Amendment to disenfranchise lawfully admitted aliens. In *Richardson v. Ramirez*, the Court recognized that "exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment, as reflected in the **express language** of § 2 **and** in the **historical and judicial interpretation** of the Amendment's applicability to state laws disenfranchising felons." 418 U.S. 24, 54 (U.S. 1974) (emphasis added). Unlike the Fourteenth Amendment, the Second Amendment has no "express language" combined with "historical and judicial interpretation" affirmatively sanctioning disenfranchisement of lawfully admitted aliens.[6] To imply such an affirmative sanction, without support from the text of the Amendment, would cast the protection of six other sister provisions of the Constitution that mention 'the people' into question for lawfully admitted aliens. The

---

[4] Who include lawfully admitted aliens residing in other states. *See* Mass. Gen. L. c. 140, § 131F.
[5] Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 164, 179 (1994) ("The strong nativist movement that played a part in the KKK's resurgence in the 1920s appears to have also played a part in the passage of laws prohibiting resident aliens from possession of firearms."). "State legislatures enacted these types of gun laws within the first few decades of the twentieth century, when fear of foreign anarchists during the red-scare era, notions of immigrant mental deficiencies, and stereotypes of immigrants' laziness and proclivity towards crime dominated the popular and political consciousness." Pratheepan Gulasekaram, *Aliens with Guns: Equal Protection, Federal Power, and the Second Amendment*, 92 Iowa L. Rev. 891, 909 (2007).
[6] On the contrary, courts have struck down laws preventing lawfully admitted aliens from accessing firearms for self defense. *See, e.g., Chan v. City of Troy*, 559 N.W.2d 374 (Mich. Ct. App. 1997) (striking down Michigan's alienage distinction in firearms law as a violation of the Equal Protection Clause of the U.S. Constitution); *People v. Rappard*, 28 Cal. App. 3d 302, 305 (Cal. Ct. App. 1972) (declaring the state's ban on alien concealed-weapon possession unconstitutional as violation of state and federal equal-protection principles). *See also Patsone v. Commonwealth of Pennsylvania*, 232 U.S. 138, 143 (1914) (upheld a ban on hunting weapons by unnaturalized foreign born resident of Pennsylvania but acknowledged that a handgun may be necessary for self-defense).

Court in *Heller* recognized the pre-existing right to bear arms is in no "manner dependent upon [the Second Amendment] for its existence." *Heller*, 554 U.S. at 592. Therefore, the Second Amendment's text functions to recognize the pre-existence of the right, not limit that right to a class of people. To imply otherwise requires one to accept that certain classes of individuals enter this world with lesser rights than others.

> **B.** **State Law Limiting Firearms Rights Based On Alienage Violate the Plaintiffs' Equal Protection Rights.**

"Equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (U.S. 1976). In this case, strict scrutiny is independently required both because the defendants have disadvantaged a suspect class, without exception, as well as interfered with the exercise of a fundamental right.

> **1.** **State Law Limiting Firearms Rights Based On Alienage Are Subject to Strict Scrutiny.**

The facts as alleged indicate that Dr. Fletcher and Mr. Pryal were and would continue to be denied the ability to apply for a License to Carry pursuant to Mass. Gen. L. c. 140, § 131 solely, because they are not United States citizens. It is incontestable that Mass. Gen. L. c. 140, § 131 makes lawfully admitted alienage an absolute bar to obtaining a License to Carry in the Commonwealth. Mass. Gen. L. c. 140, §§ 129B and 131 and all other Commonwealth statutory language, which restrict lawfully admitted aliens firearms rights and privileges based on citizenship, violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution by discriminating based solely on alienage.

Generally, the Commonwealth may enact statutes not implicating fundamental rights that discriminate between people based on numerous types of criteria without violating the

Constitution, but at the very least, such discrimination must satisfy the rational basis test. *See Murgia*, 427 U.S. at 312-17. However, when a state discriminates against a suspect class for the purposes of the Equal Protection Clause, such as alienage,[7] the statute is reviewed under "strict scrutiny" and the Defendants then bear the burden of proof that the statute "advance[s] a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). *See Johnson v. California*, 543 U.S. 499, 506 (2005) ("[T]he government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interest.'"(citation omitted)). The Court has held that alienage itself is a suspect classification in the hands of the states, even when it does not overtly operate as a proxy for race. *See*, *e.g.*, *Graham*, 403 U.S. at 371-72 (striking down state welfare laws with alienage distinction); *Takahashi*, 334 U.S. at 418.

In this case Mass. Gen. L. c. 140, §§ 129B and 131 explicitly discriminate on the basis of alienage because they only allows United States citizens to obtain Licenses to Carry. This case does not involve "facially neutral legislation" and instead Mass. Gen. L. c. 140, §§ 129B and 131 and other Commonwealth laws limiting firearm rights based on alienage create overt classifications based on a suspect class. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484-85 (U.S. 1982). Therefore, these offending statutes must survive intense judicial scrutiny.

### 2. No Exceptions Apply To The Application of Strict Scrutiny to the Commonwealth's Alienage Based Discrimination.

First, the defendants may not rely on the "public position" exception to avoid application of strict scrutiny. This exception only arises in matters of denied or limited employment. *See*, *e.g.*, *Daley v. Massachusetts Bay Transp. Authority*, 1981 U.S. Dist. LEXIS 14493 (D. Mass.

---

[7] "The Court has ruled that classifications by a State that are based on alienage are 'inherently suspect and subject to close judicial scrutiny.'" *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977). *See also Examining Bd. Of Eng'rs, Architects, and Surveyors v. Flores De Otero*, 426 U.S. 572, 601-02 (1976), *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

Sept. 8, 1981). "To find if this governmental function exception applies in a given instance, a reviewing court must ask whether the 'position in question . . . involves discretionary decision making, or execution of policy, which substantially affects members of the political community.'" *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 229 (1st Cir. P.R. 1992) (quoting *Foley v. Connelie*, 435 U.S. 291, 296 (1978)). In this case, the plaintiffs are not requesting employment as police officers,[8] public school teachers,[9] probation officers,[10] jury members,[11] or other socially commanding employment in the Commonwealth.

Second, the Defendants may not rely on any "special public-interest doctrine" in application of its police powers to avoid "strict judicial scrutiny" of the subject statute. *See Graham v. Richardson*, 403 U.S. 365, 373-74 n.7-9 (1971). In *Graham*, the Court questioned whether any "contemporary vitality" existed for the special public-interest in 1971. *Id.* The First Circuit has further "put to rest the 'special public-interest doctrine.'" *Mohamed v. Parks*, 352 F. Supp. 518, 520 (D. Mass. 1973); *see also Hall v. INS*, 253 F. Supp. 2d 244, 253 n.16 (D.R.I. 2003). Additionally, should the "special public-interest doctrine" be exhumed, the defendants have failed to present any public-interest served by the offending statutes.

Third, the Defendants may not rely on any "unusual circumstance" exception. There is no such "unusual circumstance" mitigating application of strict scrutiny, because the fundamental right to bear arms is a right enjoyed fully by lawfully admitted aliens. Unlike constitutional prohibitions against felons and aliens wishing to vote and run for office, the Second Amendment contains neither express language nor historical and judicial interpretation that permits exclusion of lawfully admitted aliens. Additionally, the defendant's reliance on *Mathews v. Diaz* is

---

[8] *Foley*, 435 U.S. at 296.
[9] *Ambach v. Norwick*, 441 U.S. 68, 75-81 (1979).
[10] *Cabell v. Chavez-Salido*, 454 U.S. 432, 441-46 (1982).
[11] *Perkins v. Smith*, 370 F. Supp. 134, 138-39 (D. Md. 1974), aff'd, 426 U.S. 913 (1976).

misplaced as the "real question presented by th[e] case [was] not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination within the class of aliens – allowing benefits to some aliens but not to others – is permissible." 426 U.S. at 80 (addressing whether a Federal law violated the due process under the Fifth Amendment). The challenged provisions in this matter are not Federal laws and do not allocate benefits, while promoting discrimination directly between citizens and aliens.

Therefore, because the "public position" and "unusual circumstance" exceptions do not apply and the "special public-interest doctrine" no longer exists, the offending statutes are subject to strict scrutiny.

### 3. Strict Scrutiny Is Separately Warranted On A "Fundamental Rights" Theory.

The Second Amendment secures a fundamental right. *McDonald*, 130 S.Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring).  As such, the Commonwealth's absolute ban on handgun possession, purchase, and ownership by lawfully admitted aliens residing in the Commonwealth is subject to strict scrutiny. Generally, when "fundamental rights" are involved, the Court requires regulations limiting these rights to be justified by a "compelling state interest." *See Kramer v. Union Free School District*, 395 U.S. 621, 627 (1969); *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969); *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). Additionally, "classifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted).

The Court in *Heller* clearly indicates that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Heller*, 554 U.S. at 629 n.27. Therefore, the Court ruled out any application of rational basis review of laws

burdening the Second Amendment.[12] Intermediate scrutiny is also not applicable, as it is reserved for "quasi-suspect" cases, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985), where the government's classifications do not relate to enumerated rights or suspect classes, and would thus trigger only un-enhanced rational basis review in the absence of intermediate scrutiny's boost. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

Further, "gun laws that severely restrict the core Second Amendment right identified in *Heller*-that of 'law-abiding, responsible citizens to use arms in defense of hearth and home' should receive exacting scrutiny." *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (quoting *Heller*, 554 at 627). The 7th Circuit's use of "citizen" in *Skoien*, as in *Heller*, should be read to include the plaintiffs in this matter. This application of strict scrutiny should be expected when laws limit the exercise of a core fundamental right in the Bill of Rights. *See*, *e.g.*, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000) (law regulating the content of speech is subject to strict scrutiny).

Since *Heller*, multiple Circuits have grappled with the Court's express avoidance of a standard of review for Second Amendment matters. In these matters, these Courts applied intermediate scrutiny in Second Amendment cases questioning laws of the type Heller identified as presumptively lawful. See *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *United States v. Masciandaro*, 2011 WL 1053618 (4th Cir. 2011); *United States v. Chester*, 628 F.3d 673(4th Cir. 2010). The most important conclusion to note from these decisions, regardless of their flawed logic,[13] is the limited

---

[12] The Ninth Circuit recently reviewed a firearm possession restriction on county fair grounds that constructively banned gun shows and held that such restrictions failed to trigger heightened scrutiny because they did not substantially burden the right to keep and bear arms.  *Nordyke v. King*, 2011 WL 1632063 (9th Cir. 2011). *Compare United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010) (a law making  possession of firearm without a serial number illegal may impinge protected conduct, but passes both intermediate and strict scrutiny).

[13] In *Heller*, the Court explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and

application of intermediate scrutiny to violent felons, drug abusers, and other dangerous individuals. Therefore, these intermediate scrutiny decisions lend nothing to the matter at hand, unless lawfully admitted aliens residing in the Commonwealth should be considered members of this pool of felons, misdemeanants, and scoundrels.

The Fourth Circuit applied intermediate, rather than strict scrutiny, to a domestic violence misdemeanant only because it viewed the Second Amendment's core as reaching "law-abiding, responsible citizen[s]," *Chester*, 2010 U.S. App. LEXIS 26508 at *26 (emphasis original). The opinion clearly indicates that strict scrutiny must apply in Second Amendment cases involving ordinary individuals. And the Seventh Circuit has further suggested overbreadth is a possible alternative mode of analysis. *United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010); *cf. United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) ("felon-in-possession laws could be criticized as 'wildly overinclusive'"). These determinations are consistent with the understanding that intermediate scrutiny applies to an enumerated right only under circumstances where the right's exercise is "of less constitutional moment." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980).

---

home. 554 U.S. at 627. In these Circuit opinions, each court cites the preceding quote as justification to consider the individual claiming Second Amendment rights *prior* to selecting a standard of review. *See, e.g.*, *Chester*, 628 F.3d at 682-83 ("we believe his claim is not within the core right identified in *Heller* . . . by virtue of [his] criminal history as a domestic violence misdemeanant."). In *Heller*, the Court also indicated "presumptively lawful regulatory measures" such as "prohibitions on the possession of firearms by felons." 554 U.S. at 626. In these Circuit opinions, the courts further use this presumptively permissible restriction to justify considering the individual claiming Second Amendment rights *prior* to selecting a standard of review. *See, e.g.*, *Skoien* 614 F.3d at 812 ("Though explained, the Court's willingness to presume the constitutionality of various firearms restrictions--especially the prohibitions on firearms possession by felons--gives us ample reason to believe that strict scrutiny does not apply here.").

Looking beyond a challenged law's impact on the fundamental right to bear arms in this fashion, prior to selecting a standard of review, will permit exclusion of firearm ownership by any class of individual (such as members of a certain sex, race, or religion) that the Commonwealth deems irresponsible or a felon (regardless of the due process followed in such determination). Any law that impacts the "core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, must be subject to strict scrutiny, regardless of the individual claiming that right. Thereafter, laws preventing firearm ownership by felons and the mentally ill will be lawful unless they fail to be narrowly tailored to achieve that presumptively compelling interest. *See also United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010).

Further, the defendants' reliance on *Eulitt ex rel. Eulitt v. Maine Dep't of Educ.*, is misplaced as "the Free Exercise Clause provides the primary framework for assessing religious discrimination claims." 386 F.3d 344, 354 (1st Cir. Me. 2004) (paraphrasing *Locke v. Davey*, 124 S.Ct. 1307, 1313 (U.S. 2004)). In this matter, the Second Amendment has no such Amendment based textual architecture for assessing any discrimination claim.

C.    **State Law Limiting Firearms Rights Based On Alienage Fail To Satisfy Any Level of Scrutiny.**

Starting first with strict scrutiny, the Defendants have not alleged that a wholesale ban of lawfully admitted aliens, a suspect class, in Mass. Gen. L. c. 140, §§ 129B and 131, is the least restrictive means available to achieve any compelling Commonwealth interest. Under this analysis, the Commonwealth carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United v. FEC*, 130 S.Ct. 876, 898 (2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are available to achieve the same purpose. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *see also United States v. Engstrum*, 609 F. Supp. 2d 1227, 1331- 32 (D. Utah 2009) (applying strict scrutiny in Second Amendment analysis).

The offending statutes amount to a prohibition of an entire class of arms in common use, which extends to the plaintiffs' homes, "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 556. In addition, the defendants have failed to present a single compelling Commonwealth interest served by the offending statutes or even claimed that such statutes are the least restrictive means of serving said interest(s). Instead, the defendants fail to present, defend, or distinguish Mass. Gen. L. c. 140, § 131F, which *permits issuance of licenses to carry firearms and ammunition in the Commonwealth to lawfully admitted aliens residing in*

*other states*. Therefore, the offending statutes are insufficiently tailored toward achieving any legitimate interest of the Commonwealth and therefore violate the Equal Protection Clause.

Although strict scrutiny is clearly applicable, even if intermediate scrutiny were the relevant standard, the offending statutes fail to satisfy the intermediate standard as well. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (U.S. 1988). The government "bears the burden of justify its restriction, [and] it must affirmatively establish the reasonable fit" "between the legislature's ends and the means chosen to accomplish those ends." *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (U.S. 1989). "'[I]ntermediate' scrutiny permits us to evaluate the rationality of the legislative judgment . . . we employ this standard to aid us in determining the rationality of the legislative choice." *Plyler v. Doe*, 457 U.S. 202, 217 n.16 (1982). The Commonwealth lacks any governmental interest, much less a compelling one, in preventing lawfully admitted aliens from exercising their constitutional rights, even if the exercise of the right imperils public safety, something that has not be alleged.

Finally, even if the Court elects to apply the lowest level of scrutiny, the offending statutes fail to satisfy the standard. Under the rational basis test, the Plaintiff must establish that the state's actions are not rationally related to a legitimate state interest. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83-84 (2000). Wholesale bans of handgun ownership, as in *Heller*, fail to meet any level of scrutiny.[14] Further, as applied to intermediate scrutiny, the Commonwealth cannot logically present a legitimate state interest in preventing lawfully admitted aliens from exercising a constitutional right.

---

[14] "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." *Heller*, 554 U.S. at 628 (citation omitted).

D.     **State Law Limiting Firearms Rights Based On Alienage Are Further Unconstitutional Because They Interfere With The Exclusive Federal Right to Regulate Immigration and Naturalization.**

The challenged Commonwealth laws limiting firearms rights based on alienage encroach upon exclusive Federal power, and are constitutionally impermissible. "Congress has enacted a comprehensive plan for the regulation of immigration and naturalization, and has guaranteed to aliens 'the full and equal benefit of all laws . . .'" *Mohamed v. Parks*, 352 F. Supp. 518, 521 (D. Mass. 1973) (quoting 42 U.S.C. § 1981 (1970)). The Federal Government has "broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." *Takahashi v. Fish & Game Comm'n*, 334 U.S. at 419; *see also Graham v. Richardson*, 403 U.S. at 376 et seq. Like the City of Boston's denial of employment to lawfully admitted aliens in *Mohamed*, the defendants in this matter have denied the plaintiffs the ability to defend themselves in their own homes.[15]

The Federal government has elected to employ its exclusive Federal power by criminalizing gun sales to, and gun possession by, illegal aliens and United States citizens who have renounced their citizenship. 18 U.S.C. §§ 922(g)(5), (g)(7), (d)(5), (d)(7). Further, the Federal government has criminalized gun possession for those "admitted to the United States under a nonimmigrant visa,"[16] 8 U.S.C. § 922(g)(5)(B), unless the alien is "admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States." 8 U.S.C. § 922(y)(2)(A). The offending statutes attempt to regulate the conduct of lawfully admitted aliens residing in the Commonwealth, while

---

[15] "[I]f such a policy were permissible, the practical result would be that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the States as chose to offer hospitality." *Truax v. Raich*, 239 U.S. 33, 42 (1915).

[16] Aliens admitted under nonimmigrant visas are defined in 12 U.S.C. § 1101(a)(15).

generating an inhospitable encumbrance of privileges conferred by admission, in an area of exclusive and extensively exercised Federal power. Hence the offending statutes are constitutionally impermissible.

## II.        The Challenged Statutory Provisions Are Facially Invalid

The defendants allege that a facial challenge cannot be sustained against the offending statutes because the laws have both "a plainly legitimate sweep," Def. Guida's Br. at 14 (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008)), and because the plaintiffs cannot "establish that no set of circumstances exists under which the Act would be valid." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Although the defendants passively present the two standards as equal, the "plainly legitimate sweep" standard is far more permissive than the "no set of circumstances" standard. *See, e.g.*, *Wash. State Grange*, 552 U.S. at 449; *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring in judgments) ("I do not believe the Court has ever actually applied such a strict standard, even in Salerno itself").[17]

By its terms, *Salerno* never applied to First Amendment cases. *Salerno*, 481 U.S. at 745. Nor did it apply in abortion cases, where laws were deemed facially invalid when they imposed undue burdens on abortion access not in all cases but "in a large fraction of the cases." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 895 (1992). Most importantly, the *Salerno* "no set of circumstances" standard did not apply in *Heller* or *McDonald*. Heller sustained a facial challenge to three generally-applicable gun laws. The Supreme Court acknowledged that some individuals could be denied firearms. *Heller*, 554 U.S. at 626. *McDonald* rejected arguments for why a handgun ban might be available to state actors, even

---

[17] Recently, the Supreme Court presented the "plainly legitimate sweep" standard as a valid alternative to the "no set of circumstances" standard for facial challenges. *United States v. Stevens*, 130 S.Ct. 1577, 1587 (2010).

were it unavailable to federal actors, but reiterated the notion that at least some individuals could be denied access to handguns.

A.    **Although a License to Carry May Permit Allegedly Non Protected Conduct Under The Second Amendment, Those Laws Remain Facially Invalid.**

Commonwealth statutes containing language disqualifying aliens cannot be defended as facially acceptable because said statutes permit other conduct that is allegedly not protected under the Second Amendment.  The individual plaintiffs in this matter claim no desire to carry firearms outside their home. The state cannot prevent possession of the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, by compounding such a restriction, in the text of a statute licensing, with conduct allegedly non-fundamental under the Second Amendment. The Commonwealth has elected to not restrict all lawful handgun owners from carrying handguns and possessing high capacity long arms by default, reserving "such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. L. 140, § 131. The Commonwealth cannot avoid facial challenges to prohibitions of fundamentally protected conduct by conflating such prohibitions with bans of conduct allegedly non-fundamental under the Second Amendment.

B.    **Illegal Aliens and Lawfully Admitted Aliens Who Do Not Establish Residence in the Commonwealth Do Not Impact This Facial Invalidity.**

Any lawfully admitted alien that is both capable of and elects to establish residence lawfully in the Commonwealth, is a "person" recognized and protected by the Second Amendment. Federal law criminalizes gun sales to, and gun possession by, illegal aliens and United States citizens who have renounced their citizenship, 18 U.S.C. §§ 922(g)(5), (g)(7), (d)(5), (d)(7), and makes those entering the United States improperly criminals. 8 U.S.C. § 1325. Federal and exclusive means already exist to exclude ownership or permit sale to all alien applicants, except lawfully admitted aliens. Reiterating said Federal laws does nothing to further

the legitimate sweep of the offending statutes. Further, the residency requirements, which are not

being challenged in this action and contained within Mass. Gen. L. c. 140, §§ 129B and 131,

exclude aliens of any type that do not reside in the Commonwealth from a "facial" analysis.

Therefore, any lawfully admitted alien that is capable of lawfully establishing residence in the

Commonwealth and elects to do so becomes part of the "national community" and "develop[s]

sufficient connection with this country to be considered part of that community." *Heller*, 554

U.S. at 580.

The plainly illegitimate sweep of the Commonwealth's law is to encumber the Second

Amendment for individuals who enjoy its protection, discriminate against the same as a

protected class, and encroach upon an exclusive Federal right to regulate immigration and

naturalization.[18] Therefore, the offending statutes are unconstitutional on their face.

**III.      Each Corporate Plaintiff Has Established Standing.**

Plaintiffs Second Amendment Foundation, Inc. ("SAF") and Commonwealth Second

Amendment, Inc. ("C2A") have demonstrated both associational and representational standing.

C2A's pending tax determination has no bearing on its standing, beyond a beneficial inference

that it acts as a charitable and educational organization "focusing on the Constitutional right

privately to own and possess firearms." Compl. ¶ 5. The defendants are correct to concede that

SAF and C2A have established that (1) the interests at stake in this matter are germane to the

organizations' purpose and their (2) individual members' participation is not necessary to either

---

[18] In *Finch v. Commonwealth Health Insurance Connector Authority*, the Massachusetts Supreme Judicial Court recognized:

> Where the Federal government has made a binding decision regarding the treatment of aliens, that decision will be reviewed according to the standards applicable to the Federal government even though the immediate actor may be a State government. In comparison, where the State acts on its own authority, it cannot shelter behind the existence of Congress's plenary authority and its actions are subject to strict scrutiny review.

2011 Mass. LEXIS 253, 34-35 (May 6, 2011).

the claim asserted or the relief requested. *Animal Welfare Institute v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010). Therefore, SAF and C2A may sue based on injuries to its members and supporters if "at least one of [their] members would have standing to sue as an individual." *Id.*

SAF and C2A have respectively alleged membership and supporters that include "lawfully admitted aliens residing in the Commonwealth." Compl. ¶ 5. For the purposes of opposing the defendants' motion the plaintiffs benefit from all reasonable inferences in their favor. *Langadinos*, 199 F.3d at 69. It is quite reasonable to infer that lawfully admitted aliens residing in Massachusetts, who have joined and/or supported two organizations "focusing on the Constitutional right privately to own and possess firearms," Compl. ¶ 5, desire equal treatment under the Second Amendment and more specifically desire ownership of the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Further, it is not necessary for those specific members and supporters to actually apply and be denied licenses to generate hypothetical individual standing; as such an attempt would be an exercise in futility.[19] In fact the "concrete injury"[20] suffered by these individuals is the Commonwealth's refusal to provide them with any means of applying or otherwise procuring a License to Carry. Therefore, SAF and C2A have standing.

## IV.     If Necessary, Plaintiffs Respectfully Request An Opportunity To Amend the Complaint.

If the Court feels it necessary, Plaintiff respectfully asks the Court to provide the plaintiffs an opportunity to amend the complaint.

## CONCLUSION

WHEREFORE, Defendant Jason A. Guida's, Defendant Robert C. Haas', and Defendant Mark K. Leahy's motions to dismiss must be denied.

---

[19] "We will not require such a futile gesture as a prerequisite for adjudication in federal court." *Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) (quoting *Williams v. Lambert*, 46 F.3d 1275, 1280 (2d Cir. 1995)).
[20] *United States v. AVX Corp.*, 961 F.2d 108 (1st Cir. 1992).

Respectfully submitted,

Christopher M. Fletcher, Eoin M. Pryal, Second
Amendment Foundation, Inc., and Commonwealth
Second Amendment, Inc.
By their attorney,

Dated: June 10, 2011                   /s/ Joseph M. Hickson III

Joseph M. Hickson III
Hickson Law Group, P.C.
51 Taylor Street, 3rd Floor
Springfield, MA 01103
Phone: 413.732.7708
Fax: 413.375.9888
BBO # 665687
Email: jhickson@HicksonLawGroup.com

## CERTIFICATE OF SERVICE

I, Joseph M. Hickson III, hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as identified on the Notice of Electronic
Filing, and paper copies will be sent to those indicated as non-registered participants on June 10,
2011.

Dated: June 10, 2011                   /s/ Joseph M. Hickson III
                                        Joseph M. Hickson III