UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER M. FLETCHER, EOIN M. PRYAL, SECOND AMENDMENT FOUNDATION, INC., and COMMONWEALTH SECOND AMENDMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT C. HAAS, in his capacity as Cambridge Commissioner of Police, MARK K. LEAHY, in his capacity as Northborough Chief of Police, and JASON A. GUIDA, ESQ., in his capacity as Director of the Firearms Records Bureau, <br><br> Defendants. | CIVIL ACTION NO. 11-10644-DPW |

MEMORANDUM AND ORDER
March 30, 2012

This case presents the question whether lawful permanent resident aliens[1] are among "the people" for whom the Second Amendment the United States Constitution provides a right to bear arms.  I conclude they are.

---

[1]  A lawful permanent resident is an alien who has been granted the privilege of residing permanently in the United States *See* 8 U.S.C. § 1101(a)(20).  Generally, to be eligible for naturalized citizenship, an alien must have been in lawful permanent resident status for not less than five years.

1

Plaintiffs seek to enjoin enforcement of the citizenship requirement contained in Massachusetts General Laws chapter 140, sections 129B and 131, and all other Massachusetts provisions which prohibit firearm possession by all lawfully admitted aliens.

Defendants have moved to dismiss this action, contending that the Second Amendment grants the right to bear arms only to citizens.  Plaintiffs have in turn moved for summary judgment to establish that lawfully admitted aliens have the same right to bear arms as do citizens.  Because the only plaintiffs with standing in this case are lawful *permanent* resident aliens, I resolve the issue only as to lawful permanent resident aliens and do not reach the question whether the Second Amendment provides protection for other lawful aliens.

## I.  BACKGROUND

A.  The Massachusetts Firearm Regulatory Regime

Massachusetts strictly regulates the possession of weapons through a licensing regime.  *See generally* Mass. Gen. Laws. ch. 140, §§ 121-131P.  Any person residing in Massachusetts who wishes to own, possess, or purchase a firearm,[2] rifle,[3] shotgun[4]

---

[2] The term "firearm" refers to "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured; provided, however, that the

2

or ammunition, must obtain a permit.  *Id.* at §§ 129C, 131E.  This permit may take the form of a firearm identification card, which allows its licensee to own and possess non-large capacity[5] shotguns and rifles.  *Id.* at § 129B(6).  It may also take the form of a license to carry,[6] which permits ownership and

---

term firearm shall not include any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors."  Mass. Gen. Laws ch. 140, § 121.

[3]  The term "rifle" means "a weapon having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger."  *Id.*

[4]  The term "shotgun" refers to "a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger."  *Id.*

[5]  The term "large capacity weapon" means to "any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device; (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon."  *Id.*

[6]  There are two classes of license to carry in Massachusetts.  Class A allows the licensee to possess large capacity firearms and to carry these weapons in a concealed manner, whereas Class B is more restrictive.  *Id.* §§ 131(a)-(b).

possession of a broader selection of weapons, including certain firearms.  *Id.* at § 131(a) & (b).

Massachusetts denies to all aliens, illegal or legal, the right to obtain firearm identification cards or licenses to carry.  *Id.* at §§ 129(B)(1)(vii), 131(d)(v).  That general ban has two exceptions, however.  Lawfully admitted aliens residing in Massachusetts may obtain a resident alien permit, which allows them "to own or have in his possession or under his control a rifle or shotgun," but not a firearm.  *Id.* at § 131(H).  In addition, lawfully admitted aliens residing in *other states* may obtain temporary licenses to carry firearms "for purposes of firearms competition."  *Id.* at § 131(F).

B.   The Parties

Plaintiffs Christopher Fletcher and Eoin Pryal are lawful permanent residents who emigrated from the United Kingdom and who now reside respectively in Cambridge and Northborough, Massachusetts.  Except for a two year period between 1999 and 2001, Fletcher has resided in the United States continuously since 1995, and became a permanent resident alien on June 8, 2009.  Prior to moving to Massachusetts, Fletcher resided in California, where he held a Basic Firearms Safety Certificate and a Handgun Safety Certificate, which allowed him to purchase and possess firearms in the state of California.  Upon relocating to Massachusetts, Fletcher completed the Massachusetts Basic

Firearms Safety Course as required by Massachusetts General Laws chapter 140, section 131P, and was awarded the Massachusetts Basic Firearms Safety Certificate on June 21, 2008.

Pryal, who is married to a United States citizen, was a Rifleman in the British Territorial Army before emigrating to the United States.  In the United Kingdom, Pryal was granted a shotgun certificate and international dealer's license which permitted him to travel to other countries with his own firearms for hunting purposes.  Currently, Pryal is an assistant instructor at the Massachusetts Firearm School in Framingham, Massachusetts, and a customer service representative at a Massachusetts-based firearm manufacturer.  Pryal completed the Massachusetts Basic Firearms Safety Course, and was awarded the Massachusetts Basic Firearms Safety Certificate on October 25, 2010.

Both Fletcher and Pryal applied for, and were denied, a license to possess a firearm in their home for immediate self-defense purposes.  Neither applied for a license to carry a firearm on his person outside of the home.

Plaintiffs Second Amendment Foundation, Inc. ("SAF") and Commonwealth Second Amendment, Inc. ("CSA") are organizations whose purpose is the defense of the constitutional right to own and possess firearms.  Both organizations claim to have as members lawfully admitted aliens residing in Massachusetts.

Defendants Robert Haas, as Cambridge Commissioner of Police, and Mark Leahy, as Northborough Chief of Police, are responsible for determining whether to issue firearm identification cards and licenses to carry to residents of their municipalities.  For his part, defendant Jason Guida, as Director of the State Firearms Records Bureau, is in charge of issuing resident alien permits.

## II.  STANDARDS OF REVIEW

### A.  Motion to Dismiss

A district "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  In considering a motion to dismiss, the court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader." *S.E.C. v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc).  The rules of pleading require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  This statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48-49 (1st Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### B.  Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  "A dispute is genuine if the evidence about the fact
is such that a reasonable jury could resolve the point in the
favor of the non-moving party," whereas "[a] fact is material if
it has the potential of determining the outcome of the
litigation." *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777,
782 (1st Cir. 2011) (quoting *Rodríguez-Rivera v. Federico Trilla
Reg'l Hosp.*, 532 F.3d 28, 30 (1st Cir. 2008)).  Traditionally, a
district court must "draw every reasonable inference in favor of
the nonmoving party" on summary judgment. *Lopera v. Town Of
Coventry*, 640 F.3d 388, 407 (1st Cir. 2011).  But, where, as
here, a party has cross-moved for summary judgment, a district
court "must determine based on the undisputed facts whether
either the plaintiffs or the defendants deserve judgment as a
matter of law." *Hartford Fire Ins. Co. v. CNA Ins. Co. (Europe)
Ltd.*, 633 F.3d 50, 53 (1st Cir. 2011) (quotation and citation
omitted).

### III.  DISCUSSION

A.   Do The Plaintiff Organizations Have Standing?

        Standing is a prerequisite for Article III jurisdiction, and
thus must be determined before addressing the merits of a case.
*See Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir.
2009).  To establish standing, a plaintiff must "present an
injury that is concrete, particularized, and actual or imminent;

fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *Ramírez-Lebrón v. Int'l Shipping Agency, Inc.*, 593 F.3d 124, 130 (1st Cir. 2010) (quoting *Horne v. Flores*, 129 S. Ct. 2579, 2592 (2009)). In the context of an organization suing on behalf of its members, the organization must demonstrate "(1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members' participation is not necessary to either the claim asserted or the relief requested." *Animal Welfare Inst. v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Only the first prong of the test is in dispute in this case.

As to the first prong, the Plaintiff organizations fall short of demonstrating Article III standing. Neither SAF nor CSA has identified a *single* member who sought to obtain a license to carry a firearm in Massachusetts, let alone was denied. *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (concluding that organization lacked standing where it failed to identify any member who had standing in his or her own right). Instead, both organizations allege in a conclusory fashion that their members include "lawfully admitted aliens residing in the Commonwealth." That lawfully admitted aliens residing in Massachusetts have joined SAF or CSA is, without more,

insufficient to show that these members themselves suffer harm from the Massachusetts firearms regulatory regime.  Not every lawfully admitted alien residing in Massachusetts who decides to join this type of organization can *necessarily* be said to intend to own or possess a firearm himself or herself, and to have been denied that right.  Critically, SAF and CSA have failed to allege that any of their members who are lawfully admitted aliens "intend to purchase firearms domestically in violation of the laws at issue." *See Hodgkins v. Holder*, 677 F. Supp. 2d 202, 206 (D.D.C. 2010) (dismissing claims brought by SAF for lack of standing on the same ground presented here).

Even viewing the facts in the light most favorable to plaintiff organizations, SAF and CSA fail to establish that "at least one of [their] members would have standing to sue as an individual." *Animal Welfare*, 623 F.3d at 25.  Accordingly, I will grant the defendants' motion to dismiss the claims brought by SAF and CSA for lack of standing.

B.  Does the Second Amendment Protect Permanent Resident Aliens?

The crux of this case is whether the Massachusetts firearms regulatory regime, as applied to Fletcher and Pryal, violates the Second Amendment or the Equal Protection clause of the Fourteenth Amendment.[7]

---

[7]  Although plaintiffs also contend that the Massachusetts firearms regulatory regime is unconstitutional on its face, they concede that the regime could be constitutionally applied to an illegal alien or a lawfully admitted alien who does not establish

The Second Amendment of the United States Constitution, provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  To determine whether the Massachusetts firearms regulatory regime impermissibly encroaches on the Second Amendment rights of Fletcher and Pryal, I begin with the Supreme Court decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

In *Heller,* the Court struck down several District of Columbia statutes prohibiting the possession of handguns. *Heller,* 554 U.S. at 575.  The Court held that the Second Amendment guarantees an "individual right" to possess and carry weapons for the lawful purpose of self-defense.  *Id.* at 580. Because "the need for defense of self, family and property is most acute" in the home, the Court reasoned that the right to bear arms applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family."  *Id.* at 628; *see also id.* (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense).  Thus, the Court concluded that "a complete prohibition of the[] use [of handguns] is invalid."

---

residence in Massachusetts.  Thus, the plaintiffs' facial attack fails because they have not established "that no set of circumstances exists under which the [statutes] would be valid." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted).  Only the plaintiffs' "as applied" challenge remains.

*Id.* at 629.  It noted, however, the right to bear arms is "not

unlimited."  *Id.* at 595.  Although the Court declined to "clarify

the entire field" of the Second Amendment, *id.* at 635, it

emphasized that the opinion in no way casts doubt on certain

"presumptively lawful regulatory measures."  *Id.* at 626 n.26.

Such measures include, but are not limited to, "longstanding

prohibitions" on the possession of firearms by felons and the

mentally ill, carrying concealed weapons, carrying firearms in

sensitive places such as schools and government buildings, or

laws imposing conditions and qualifications on the commercial

sale of arms.  *Id.* at 626-27.

Applying this framework, *Heller* has been read to direct "a

two-prong approach to Second Amendment challenges" to state

statutes:

> First, we ask whether the challenged law imposes a burden
> on conduct falling within the scope of the Second
> Amendment's guarantee.  If it does not, our inquiry is
> complete.  If it does, we evaluate the law under some
> form of means-end scrutiny.  If the law passes muster
> under that standard, it is constitutional.  If it fails,
> it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)

(internal citation omitted).[8]  I will address the steps in

---

[8]  A Ninth Circuit panel recently applied a somewhat
different approach for Second Amendment challenges.  In *Nordyke
v. King*, a divided panel stated that a court must apply a
"*substantial* burden framework" before applying heightened
scrutiny.  644 F.3d 776, 783-86 (9th Cir. 2011) (emphasis added),
*reh'g en banc granted*, 644 F.3d 776 (9th Cir. Nov. 28, 2011)
(argued Mar. 19, 2012).  Under this framework, only laws that
"substantially burden" the Second Amendment will be subject to

sequence.

1.   *The Scope of the Second Amendment*

The threshold inquiry is whether the absolute prohibition on handgun possession by Fletcher and Pryal, who are lawful permanent residents, falls within the scope of the Second Amendment.   Defendants moved to dismiss on the ground that the Second Amendment only protects United States citizens.

a.   **Historical Meaning of "The People"**

The first component of the Second Amendment codifies "the right of the people."[9]   At the time of the founding of the Constitution, the phrase "the people" was open textured.   JAMES H.

---

heightened judicial review.  *Id*.  The *Nordyke* majority specifically left open "what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights."  *Id*., at 786 n.9.  *Nordyke* suggests that a law that does not place a substantial burden on an individual's Second Amendment right may be subject to rational basis review.  *Id*. at 786 (In "a variety of contexts" the Supreme Court "applies mere rational basis scrutiny to laws that regulate, but do not significantly burden, fundamental rights.").

[9]   The term of art "the right of the people" appears in two other provisions of the Bill of Rights: in the First Amendment assembly-and petition clause, U.S. CONST. amend. I, cl. 3 ("the right of the people peaceably to assemble, and to petition the Government for a redress of grievances"), and in the Fourth Amendment search and seizure clause, *id*. amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures"). Additionally, three other provisions of the Constitution use variations of the term "the people": § 2 of Article I, *id*. art. 1, § 2 (providing that the "people" will choose members of the House), the Ninth Amendment, *id*. amend. IX ("[t]he enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."), and the Tenth Amendment, *id*. amend. X (providing that the powers not given to the Federal Government remain with the States or "the people").

KETTNER, THE DEVELOPMENT OF AMERICAN CITIZENSHIP, 1608-1870, at 209 (1978) (noting that at the beginning of the 19th century, "Americans had only begun to discover the complexity of the question 'Who are "the People?"' They were committed to certain principles about the acquisition of citizenship, but they had yet to develop fully the meaning of that status").  Citizenship at the founding of the nation reflected opposition to British loyalists, rather than the modern conception in which citizenship stands categorically distinct from immigrant status.  *Id.* at 184-85, 208.  *See also* ARISTIDE R. ZOLBERG, A NATION BY DESIGN: IMMIGRATION POLICY IN THE FASHIONING OF AMERICA 86 (2006) (recounting the development of "[n]aturalization . . . as a second-line defense against undesirable immigrants . . . [under which] the Naturalization Act of 1790 . . . specif[ied] that foreign-born persons . . . could not become naturalized without the express consent of the states.  Directed at repentant British-born Loyalists, this exclusionary provision, enacted several years after the end of hostilities, constituted one more marker of the country's emerging assertiveness as a sovereign nation and distinctive political régime").

Statements from the Framers and contemporaneous state constitutions support the notion that the term "the people" in the Second Amendment includes more than those categorized as "citizens."  For example, George Mason, considered to be one of the "fathers" of the Bill of Rights, declared in the Virginia

debates on adoption of the Constitution, "Who are the militia? They consist now of the whole people."  George Mason, *Virginia Debates on the Adoption of the Federal Constitution*, *in* 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS, ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA, IN 1787, at 425 (Jonathan Elliot ed., 2d ed. 1836).   The Virginia Constitution of 1776 defined the makeup of the "well-regulated militia" as "composed of the body of the people."  VA. CONST. OF 1776, art. I § 13.

        Other rights guaranteed by the Constitution to "the people" were freely exercised by non-citizens at the time of the founding.  For example, the right to petition the government was exercised by non-citizens, including immigrants, coming before the same First Congress that approved the language of the First Amendment and its accompanying Petition Clause.  *See, e.g.*, Report of the Committee on Claims (Dec. 28, 1795), *reprinted in* 7 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES OF AMERICA 76-78 (Kenneth R. Bowling et al. eds., 1998) (reporting on accepted petition from Canadian citizen); *id.* at 83-84 (petition from two British citizens); *id.* at 161 (petition from two French foreigners); *see generally* Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. REV. 667 (2003) (documenting the extensive history of non-citizen petitions to the English, colonial, state, and federal governments).  "History strongly suggests that the use of the word 'people' . . . was not in any

way intended to exclude noncitizens from the rights safeguarded therein."  Wishnie, *supra* at 712.

The terms "citizen" and "the people" have generally not been treated as synonymous for purposes of constitutional useage.[10] The one instance in which they were treated as equivalent by the court,[11] *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 404 (1856), was an unfortunate aberration that was subsequently overruled by the enactment of the Fourteenth Amendment.  The Fourteenth Amendment itself drew a distinction between the legal status of citizenship and the general status of personhood in consecutive clauses.  *Compare* U.S. CONST. amend. XIV, § 1, cl. 2 ("No State shall make or enforce any law which shall abridge the privileges or immunities *of citizens* of the United States." (emphasis added)), *with id.* amend. XIV, § 1, cl. 3 ("[N]or shall any State deprive *any person* of life, liberty, or property, without due process of law." (emphasis added)).  Thus, the

_____

[10]   The *Heller* opinion itself notes that at the time of the founding, the terms were used to represent different groups, though the terms themselves were not used consistently.  *Heller*, 554 U.S. at 580 n.6 ("If we look to other founding-era documents, we find that some state constitutions used the term 'the people' to refer to the people collectively, in contrast to 'citizen,' which was used to invoke individual rights. . . But that usage was not remotely uniform." (citations omitted)).

[11]   To be sure, the Federalists in their defense of the Alien and Sedition Acts also argued that aliens were not "the people."  *See* GERALD L. NEUMAN, STRANGERS TO THE CONSTITUTION:  IMMIGRANTS, BORDERS, AND FUNDAMENTAL LAW 54-56 (1996).

Fourteenth Amendment underscored that the terms "citizens" and "persons" were not considered coextensive in the Constitution.

Prior to *Heller*, the Supreme Court had only attempted to define "the people" once, in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). There, after looking at the various ways in which the Constitution used the phrase "the people," the *Verdugo-Urquidez* court held that "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 265. *Verdugo-Urquidez* concluded that Supreme Court caselaw "establishe[d] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271.

Applying this framework, the Court in *Verdugo-Urquidez* found that a Mexican citizen and resident who had been brought to the United States against his will for the sole purpose of being subjected to criminal prosecution was not protected under the Fourth Amendment because he "had no voluntary attachment to the United States that might place him among 'the people' of the United States." *Id.*

16

### b.   Language in *Heller*

Defendants nevertheless rely on *Heller* for the proposition that the Second Amendment does not protect lawful permanent residents.  Although the opinion itself did not directly address whether the Second Amendment extends to non-citizens, the *Heller* majority described the right protected by the Second Amendment as belonging variously to "citizens," "Americans," "all members of the political community," and "law abiding citizens."  *See Heller*, 554 at 579-80, 624 n.24, 625, 629-30.

Alluding to *Verdugo-Urquidez*, the Court in *Heller* stated that the term "the people" in the Constitution and Bill of Rights "unambiguously refers to all members of the political community, not an unspecified set."  *Id.* at 580.  This, however, restates the holding in *Verdugo-Urquidez*, which did not limit "the people" to the "members of the political community," but instead to those persons who have "developed sufficient connection with this country to be considered part of that community [i.e., "this country"]."  *Vergudo-Urquidez*, 494 U.S. at 265.  By restating *Vergudo-Urquidez*, *Heller* arguably moved away from the "sufficient connection" and "national community" language of *Vergudo-Urquidez* when it used the seemingly narrower terms "political community," "Americans," "citizens," and "law-abiding citizens" throughout its analysis.

17

For its part, the term "citizen" describes a legal status found separately in numerous places in the Constitution, including portions which protect fundamental rights. *See Sugarman v. Dougall*, 413 U.S. 634, 651 (1973) (Rehnquist, J., dissenting) (noting that the distinction between citizens and non-citizens "is constitutionally important in no less than 11 instances in a political document noted for its brevity"). To determine whether, in holding that the Second Amendment protects the fundamental right to possess a firearm for self defense, *Heller* intended[12] to restrict the Second Amendment to "citizens," it is useful to compare the Second Amendment as interpreted by *Heller* with other portions of the Constitution protecting fundamental rights and identify the class of those protected by those rights.

There is only one constitutional right that is exclusive to citizens:  the right to hold federal public office. *See* U.S. CONST. art. I, § 2, cls. 2-4 (limiting those who can be

---

[12]   One commentator has suggested the possibility that the use of the term "citizen" in *Heller* was not an intentional effort to restrict the scope of the term "citizen." *See* Pratheepan Gulasekaram, *"The People" of the Second Amendment:  Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. REV. 1521, 1532 (2010) ("The lack of attention by litigants and academics to the 'citizens' specified by the *Heller* majority makes sense if the reference was inadvertent or was a colloquial allusion to a general class of persons to whom all civil rights inure."); *cf.* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1255 (2006) (noting that courts are more likely to be imprecise in dicta than in an opinion's holding).

Representatives, Senators, or the President to "Citizen[s]").
The Supreme Court has upheld other citizens-only right-
restrictions arising under state and federal statutes, but has
never declared them to be mandated by the Constitution.  *See,
e.g.*, 18 U.S.C. § 611 (limiting who can vote in federal elections
to citizens); 18 U.S.C. § 1861 (jury service).  All of the
voting,[13] right to public office, and jury service rights and
restrictions have a common theme:  they are integral to self-
governance, a public good.  *See* Pratheepan Gulasekaram, *"The
People" of the Second Amendment:  Citizenship and the Right to
Bear Arms*, 85 N.Y.U. L. REV. 1521, 1570-77 (2010)(searching for
"a theoretically coherent defense of gun rights as citizenship
rights" in light of *Heller*'s reading of the Second Amendment as a
right of self defense).

---

[13] *But see* NEUMAN, *supra* n.11, at 63-71 (recounting the rise
and fall of alien suffrage in the states); *accord* Leon E.
Aylsworth, *The Passing of Alien Suffrage*, 25 AM. POL. SCI. REV.
114, 114 (1931) ("During the nineteenth century, the laws and
constitutions of at least twenty-two states and territories
granted aliens the right to vote.  This tendency reached its
greatest extent about 1875. . . . In the following decades a
steady decline set in.  The last state constitutions to grant
aliens who had declared their intention to become citizens the
full right of suffrage were those of the two Dakotas in 1889.
The movement to withdraw the right began in Illinois in 1848.  At
the opening of the present century, only one-half of the original
number, or eleven states, continued to grant this right."), *id.*
("For the first time in over a hundred years, a national election
was held in 1928 in which no alien in any state had the right to
cast a vote for a candidate for any office---national, state, or
local.").

Similarly, restrictions on non-citizen free speech that have been upheld can be understood to turn on the protection and advancement of the more general public good.  *See, e.g.,* *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952) (upholding constitutionality of statute which allowed for deportation of lawful permanent residents based on membership in the Communist party).  Frequently, the speech that is punishable if by non-citizens, but not if by citizens, is speech which is thought to undermine American society or its political system.  *See id.; see also* 8 U.S.C. § 1182(a)(3)(D) (preventing admission of immigrant members of totalitarian regimes); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (upholding denial of admission of immigrant with ties to communism).  The aim of these restrictions is a general public good:  maintaining public order and society's institutions from denigration by non-members.

In short, the protection of the public good, rather than a private right, features most prominently in the categories of citizen-only rights.  *Heller*, by contrast, explicitly holds that the Second Amendment protects not a public good like self-governance, but the private right of self defense.

*McDonald v. City of Chicago*, which incorporated the Second Amendment against the states, may be read to clarify that the *Heller* majority did not intend to limit the Second Amendment to the formal category of "citizens."  The Court in *McDonald* was faced with two options under the Fourteenth Amendment for

incorporating the Second Amendment against the states:  the Due
Process clause, or the Privileges and Immunities clause.
*McDonald*, 130 S. Ct. 3020, 3028 (2010).  There is an important
difference between the language of the two clauses:  the Due
Process clause applies to "any person," whereas the Privileges
and Immunities clause is limited to "citizens."  *Compare* U.S.
CONST. amend. XIV, § 1, cl. 2 ("No State shall make or enforce
any law which shall abridge the privileges or immunities *of
citizens* of the United States." (emphasis added)), *with id.*
amend. XIV, § 1, cl. 3 ("[N]or shall any State deprive *any person*
of life, liberty, or property, without due process of law."
(emphasis added)).  The Supreme Court, no doubt for good and
sufficient reasons other than clarifying what persons were within
the protection of the Second Amendment,[14] chose the option of
protecting Second Amendment rights under the Due Process clause
and eschewed deployment of the Privileges and Immunities clause,
which is limited to citizens.  That the majority did not choose
to rely on the Privileges and Immunities clause can be said to
reinforce the proposition that *Heller*'s periodic choice to use
the term "citizen" to describe those protected by the Second

---

[14]  *See generally* ALEXANDER M. BICKEL, THE MORALITY OF CONSENT 33
(1975) (suggesting "the concept of citizenship plays only the
most minimal role in the American constitutional system" in a
chapter entitled "Citizen or Person - What is Not Granted Cannot
be Taken Away").

21

Amendment was generated by rhetorical, not definitional, concerns.

That the term "citizen" was used rhetorically, rather than categorically, is further supported by the text of *Heller* itself. For example, in making an analogy to limits on the First Amendment, the majority noted that "we do not read the Second Amendment to protect the right *of citizens* to carry arms for any sort of confrontation, just as we do not read the First Amendment to protect the right *of citizens* to speak for any purpose." 554 U.S. at 595 (emphasis added and removed). It is axiomatic that the protections of the First Amendment are not limited to "citizens." *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded to aliens residing in this country.").[15] The term "citizen" appears to have been used in *Heller* for reasons of stylistic variety, not as a legally prescriptive holding. This seems the better reading because, as

---

[15] *See also Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority."); Jessica S. Horrocks, *Campaigns, Contributions and Citizenship: The First Amendment Right of Resident Aliens to Finance Federal Elections*, 38 B.C. L. Rev. 771, 780-94 (1997) (charting the history of First Amendment decisions regarding aliens).

noted below, the issue in *Heller* was not the scope of the term "the people," but whether the Second Amendment protected a collective or an individual right.

There nevertheless exists a dilemma for lower courts attempting faithfully to apply *Heller*.  *Heller* talks about the Second Amendment's scope using a narrow term like "citizens," and yet it holds that the Second Amendment protects the fundamental right to own firearms for self-defense, a quintessential private good unrelated to the activities of the political community. Moreover, *Heller* affirmed *Verdugo-Urquidez*, which had a broad definition of "the people."

The defendants urge me to read *Heller* narrowly, and to find the allusions to "citizens" to be evidence of an implicit holding by the Supreme Court limiting those protected by the Second Amendment to those falling in the formally defined category of "citizens."  *Heller*, however, explicitly left undefined the full breadth of Second Amendment protection when it held that "*whatever else [the Second Amendment] leaves to future evaluation*, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  554 U.S. at 635 (emphasis added).  To draw upon an analogy used in *Heller* itself, just as the First Amendment protects the speech of all persons to varying degrees (with citizens encumbered by the fewest restrictions), so too does the Second Amendment protect the right of all persons to

bear arms to varying degrees (with "law-abiding, responsible citizens" encumbered by the fewest restrictions).

The defendants' reading of *Heller* requires a considerable analytical strain.  The basic assumption in *Heller* was that it was recognizing a pre-existing right.  *Id.* at 592 ("We look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right.").  That assumption is in tension with the fact that if defendants are correct, *Heller* would be the first case to find that a solely private-good fundamental right was limited to citizens only, and to do so without mustering historical support for such a proposition.  Only two pages of the lengthy *Heller* majority opinion touch on the meaning of "the people," and in those two pages the opinion did not suggest why a shift in the scope of constitutional protections might be underway, and why such a shift would be justified on either historical or policy grounds.  Indeed, the opinion did not address whether the Second Amendment extends to non-citizens at all, let alone to the more narrow category of lawful permanent residents.  That issue was not presented because the plaintiff in *Heller* was a citizen.

I conclude that the "citizen" terminology used in *Heller* is at most dicta regarding the universe of those afforded protection by the Second Amendment.  As the First Circuit has noted, although "Supreme Court dicta may be more persuasive than such statements made by other courts, the Supreme Court itself has

recognized the limitations of its dicta." *Iguarta v. United States*, 626 F.3d 592, 610 (1st Cir. 2010) (quoting *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.")).  As far back as 1821, the Court affirmed the "maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 6 Wheat. 264, 399 (1821); *see also* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. REV. 1249, 1250 (2006) (noting that when judges accept dictum as if it were binding law, they "fail to discharge [their] responsibility to deliberate on and decide the question which needs to be decided").  As Judge Leval has observed, there is an important distinction between the language used in a case that is dictum and language that goes to a case's holding:

> It is by no means inevitable that rules initially expressed in gratuitous, nonbinding dictum would be ultimately adopted when it came time for the court to decide the issue. . . . [C]ourts are more likely to exercise flawed, ill-considered judgment, more likely to overlook salutary cautions and contraindications, more likely to pronounce flawed rules, when uttering dicta than when deciding their cases. . . . Giving dictum the force of law increases the likelihood that the law we produce will be bad law.

Leval, *supra,* at 1255.

A restriction of the Second Amendment right only to "citizens" appears unsupported by the historical meaning of the term "the people," the structure of the Constitution, and the Supreme Court caselaw *Heller* reaffirmed and relied on.  I do not embrace *Heller*'s "citizen" terminology as conclusive regarding the definition of the term "the people."  Rather, I turn to a functional analysis directed by *Verdugo-Urquidez*.

> c.   **Analysis**

The Supreme Court has long recognized that aliens may be entitled to an "ascending scale of rights" as they increase their identity with the American society.  "Mere lawful presence in the country creates an implied assurance of safe conduct and gives [an alien] certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization."  *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950).

Lawful permanent resident aliens are firmly on the path to full citizenship[16] and, although not obligated to take that path

---

[16]   Generally, a permanent resident alien can become a citizen if he establishes that he (1) is at least 18 years old; (2) has been lawfully admitted as a permanent resident for at least 5 years (less for some individuals); (3) is a person of good moral character; and (4) has established a residence and maintained continuous physical presence in the United States for a certain period of time.  *See* 8 C.F.R. § 316.2(a).

to its destination,[17] are entitled to a wide array of constitutional rights. *See Verdugo-Urquidez,* 494 U.S. at 270-71 (contrasting Fourth Amendment protections of non-resident aliens with aliens resident in the United States); *Graham v. Richardson*, 403 U.S. 365, 376 (1971) (holding that a state statute denying welfare benefits to resident aliens violates the Equal Protection Clause); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) ("It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protection of the Fifth Amendment."); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); *Wong Wing v. United States,* 163 U.S. 228, 238 (1896) (concluding that "all persons within the territory of the United States [including aliens] are entitled to the protection guarantied by [the Fifth and Sixth Amendments]"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens.").

---

[17] *See Demore v. Kim*, 538 U.S. 510, 546 (2003) (Souter, J., concurring in part and dissenting in part) ("[I]f [lawful permanent residents] *choose*, they may apply for full membership in the national polity through naturalization.") (emphasis added). In any event, lawful permanent residents aliens may remain in the United States indefinitely, as long as they do not contravene the immigration laws such that they lose their lawful permanent resident status as the result of a final administrative order. See 8 C.F.R. § 1001.1(p). *See generally Vartelas* v. *Holder*, 2012 WL 1019971, at *4-5 (S.Ct. Mar. 28, 2012).

In cases where state laws restricting the rights of aliens have been struck down, the Supreme Court has emphasized "the rights thus protected were those of aliens who were *lawfully* inhabitants of the states in question." *United States v. Portillo-Munoz*, 643 F.3d 437, 441 (5th Cir. 2011) (emphasis added). *See Kwong Hai Chew*, 344 U.S. at 596 (holding that an alien is entitled to the Fifth Amendment protection to the extent he "is a lawful permanent resident of the United States and remains physically present there"); *Truax v. Raich*, 239 U.S. 33, 39 (1915) (holding that "the complainant is entitled under the 14th Amendment to the equal protection of its laws" because he is "lawfully an inhabitant of Arizona").  The Supreme Court has explained that:

> once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. *None of these provisions acknowledges any distinction between citizens and resident aliens*. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority.

*Kwong Hai Chew*, 344 U.S. at 596 n.5 (emphasis added) (quoting *Bridges*, 326 U.S. at 161 (Murphy, J., concurring)).

In the federal context, several courts have made clear in connection with constitutional challenges to 18 U.S.C. §

922(g)(5),[18] that the Second Amendment does not extend to *illegal* aliens. *See, e.g.*, *Portillo-Munoz*, 643 F.3d at 442 ("the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States"); *United States v. Flores-Higuera*, No. 11-182, 2011 WL 3329286, at *2 (N.D. Ga. July 6, 2011) ("[I]llegal aliens . . . do not have rights under the Second Amendment in the first place because they are not among 'the people' contemplated by the Second Amendment."); *United States v. Adame-Najera*, No. 10-10-01, 2010 WL 6529643, at *2 (N.D. Ga. Nov. 24, 2010) ("Defendant, by virtue of his status as an alien who is in this country unlawfully, is not a law-abiding citizen and is disqualified from exercising the Second Amendment right to possess a firearm."); *United States v. Flores*, No. 10-178, 2010 WL 4721069, at *2 (D. Minn. Sept. 17, 2010) (holding that "an illegal alien appropriately falls within a class of people who are rightly exempted from possessing firearms, despite the Second Amendment"); *United States v. Yanez-Vasquez,* No. 09-40056, 2010 WL 411112, at *3 (D. Kan. Jan. 28, 2010) (agreeing with decisions suggesting that "illegal aliens are not protected by the Second Amendment"); *United States v. Boffil-Rivera*, No. 08-20437, 2008 U.S. Dist. LEXIS 84633, at *21-22 (S.D. Fl. Aug.

---

[18]   Section 922(g)(5), part of the federal equivalent to the Massachusetts firearms regulatory regime, makes it unlawful for illegal and non-immigrant aliens to transport or possess firearms, but does not impose specific restrictions on the right of permanent resident aliens to do so.  18 U.S.C. § 922(g)(5).

12, 2008) (noting that after *Heller*, the Second Amendment does
not apply to an unlawful alien because he "is not a citizen, is
not ostensibly a person with identifiable and significant ties to
community, and is not someone who has any duty of allegiance to
the United States").  Some courts, while reaching the same
conclusion, have left open the possibility that "lawful residents
with ties to the community" have a Second Amendment right.  *See*
*United States v. Lewis*, No. 10-007, 2010 WL 3370754, at *3 (N.D.
Ga. May 26, 2010) ("Because Defendant is not a citizen, *or at the*
*least, a lawful resident with ties to the community*, the Court
concludes that she is not a member of the 'political community'
whose rights are protected by the Second Amendment." (emphasis
added)); *see also Portillo-Munoz*, 643 F.3d at 440 (denying Second
Amendment right to defendant because "[i]llegal aliens are not
'law-abiding, responsible citizens' *or* 'members of the political
community'" (emphasis added)).[19]

---

[19]    I note that there are two decisions, rendered in
different federal districts of North Carolina that in the context
of constitutional challenges to 18 U.S.C. § 922(g)(5), conclude
*Heller* does not extend the Second Amendment to legal aliens.  *See*
*United States v. Luviano-Vega*, No. 10-184, 2010 WL 3732137, at *2
(E.D.N.C. Sept. 20, 2010) (noting *Heller* "in no way identified a
specific right of aliens—legal or not—to bear arms"); *United*
*States v. Solis-Gonzalez*, No. 08-145, 2008 WL 4539663, at *3
(W.D.N.C. Sept. 26, 2008) (finding "no persuasive support for
Defendant's argument that the 'individual right to bear firearms
conferred by *Heller* extends to aliens in possession of
firearms'").  Interestingly, neither the federal statute, 18
U.S.C. § 922(g)(5), nor its equivalent under North Carolina law,
N.C. Gen. Stat. § 14-404(c)(5), by terms restricts the right of
lawful permanent residents to possess or transport firearms.

As of the time of this writing, one state court of appeals had held that the Second Amendment applies to lawful permanent residents, striking down a prior incarnation of a Washington state statute requiring aliens to register firearms. *Washington v. Ibrahim*, 269 P.3d 292, 297 (Wash. Ct. App. 2011).  And the Massachusetts Supreme Judicial Court has held more broadly that extending fundamental rights to citizens but not to lawful permanent resident aliens would present state equal protection problems subject to strict scrutiny. *Finch v. Commonwealth Health Ins. Connector Auth.*, 959 N.E.2d 970, 984 (Mass. 2012).

With this framework in mind, I find no justification for refusing to extend the Second Amendment to lawful permanent residents.  They have necessarily "developed sufficient connection with this country to be considered part of [the] community." *Verdugo-Urquidez,* 494 U.S. at 265.  Professor Rosberg has identified as "the traditional premise of the country's immigration policy---that resident aliens are virtually full-fledged members of the American community, sharing the burdens of membership as well as the benefits."  Gerald M. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government*, 1977 Sᴜᴘ. Cᴛ. Rᴇᴠ. 275, 337 (1978).  And then-Professor Aleinikoff, a former General Counsel of the Immigration and Nationalization Service, observed a decade ago,

> Permanently residing aliens live and function much like
> citizens.  They hold jobs, attend churches, send their
> children to school, and pay taxes.  Children they give

31

> birth to in the United States are American citizens.
> From this perspective, the fact that aliens are not
> required by law to apply for citizenship is not
> surprising; in day-to-day terms, permanently residing
> aliens and citizens are already largely
> indistinguishable.

T. ALEXANDER ALEINIKOFF, SEMBLANCES OF SOVEREIGNTY: THE CONSTITUTION, THE

STATE, AND AMERICAN CITIZENSHIP 173 (2002). *See Demore*, 538 U.S. at

544 (Souter, J., concurring in part and dissenting in part)

(characterizing the lives of lawfully admitted permanent

residents as "generally indistinguishable from those of United

States citizens").

Fletcher and Pryal, who are both lawful permanent residents,

have plainly satisfied the "sufficient connection" test of

*Verdugo-Urquidez*.  Fletcher became a permanent resident in 2009.

Prior to the approval of his application for permanent residency,

which was submitted in 2005, Fletcher resided and worked lawfully

in the United States under various types of non-immigrant visas

for approximately ten years.  Before moving to Massachusetts,

Fletcher resided in California, where he was authorized to

possess firearms.  For his part, Pryal obtained permanent

residency about one year ago, after emigrating from the United

Kingdom.  He is married to a United States citizen and is

currently employed in Massachusetts.  It is beyond dispute that

plaintiffs have "accepted some societal obligations" that place

them "among 'the people' of the United States."

*Verdugo-Urquidez*, 494 U.S. at 273.

This case does not require me to decide whether Second
Amendment protection applies to *all* lawfully admitted aliens.
Nevertheless, I conclude that Fletcher and Pryal, as lawful
*permanent* resident aliens, have demonstrated that they are
protected by the Second Amendment right to bear arms.

2.    *The Constitutionality of Massachusetts Firearms
      Regulatory Regime*

Having found Fletcher and Pryal are protected under the
Second Amendment, I must evaluate under the appropriate level of
scrutiny the constitutionality of the burden imposed on that
right by the Massachusetts firearm regulatory regime.   The court
in *Heller* held that the absolute ban on handgun possession even
for self-defense in the home "would fail constitutional muster"
under "*any* of the standards of scrutiny" applied to enumerated
constitutional rights.   554 U.S. at 628-29 (emphasis added).   By
doing so, "the court expressly left for 'future evaluation' the
precise level of scrutiny to be applied to laws trenching upon
Second Amendment rights."   *United States v. Booker*, 644 F.3d 12,
22 (1st Cir. 2011) (quoting *Heller*, 554 U.S. at 626, 634-35).   As
the Fourth Circuit has explained:

> The Second Amendment is no more susceptible to a
> one-size-fits-all standard of review than any other
> constitutional right. Gun-control regulations impose
> varying degrees of burden on Second Amendment rights, and
> individual assertions of the right will come in many
> forms.   A severe burden on the core Second Amendment
> right of armed self-defense should require strong
> justification.   But less severe burdens on the right,
> laws that merely regulate rather than restrict, and laws

33

that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified.

*United States v. Masciandro*, 638 F.3d 458, 470 (4th Cir. 2011) (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)).  Nevertheless, *Heller* expressly ruled out applying rational basis review to laws encroaching upon the Second Amendment right to bear arms.  554 U.S. at 628 n.27.  The Court explained that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, [such as the Equal Protection clause] and would have no effect."  *Id.*

Since *Heller*, several circuits, including the First Circuit, have applied intermediate scrutiny in Second Amendment cases to laws identified as presumably "lawful regulatory measures."  In *Booker*, the First Circuit found that a categorical ban on gun ownership by "any person . . . who has been convicted of a misdemeanor crime for domestic violence," 18 U.S.C § 922(g)(9), was not inconsistent with the Second Amendment.  644 F.3d at 26. In reaching this conclusion, the court reasoned that the appropriate test was whether the ban was "supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." *Id.*

Other circuits have applied intermediate scrutiny to similar federal statutes restricting handgun possession for individuals with a criminal history.  *See, e.g., United States v. Staten*, 666 F.3d 154, 162-63 (4th Cir. 2011) (upholding 18 U.S.C. § 922(g)(9) under intermediate scrutiny); *Chester*, 628 F.3d at 683 (applying intermediate scrutiny, but holding government failed to carry its burden to establish a reasonable fit); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny under Second Amendment to 18 U.S.C § 922(g)(8)).  Courts have also applied intermediate scrutiny to prohibitions on gun possession outside the home, *see Masciandro*, 638 F.3d at 471 (applying intermediate scrutiny to ban on gun possession in national parks), as well as to laws prohibiting possession of certain firearms, *see Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to ban on possession of firearms with obliterated serial number).  Nevertheless, it has been recognized that "any law that would burden the 'fundamental,' core right of self-defense in the *home* by a *law-abiding* citizen would be subject to strict scrutiny."  *Masciandro*, 638 F.3d at 470 (emphasis added).

The Massachusetts firearms regulatory regime, as applied to Fletcher and Pryal, does not pass constitutional muster regardless of whether intermediate scrutiny or strict scrutiny applies.  Under intermediate scrutiny, defendants must show that the Massachusetts firearms regime is "supported by some form of

'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." *Booker*, 644 F.3d at 25 (citing *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010)).  And strict scrutiny is even more demanding, requiring evidence that the law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC,* 130 S. Ct. 876, 898 (2010) (quotation and citation omitted).

Defendants argue that Massachusetts has a compelling interest in limiting the proliferation of firearms because of their inherent danger.  But defendants fail to establish that the statute is either substantially related to, or narrowly tailored to serve, this interest in a constitutional fashion.  Although Massachusetts has an interest in regulating firearms to prevent dangerous persons from obtaining firearms as recognized in *Booker*, the statute here fails to distinguish between dangerous non-citizens and those non-citizens who would pose no particular threat if allowed to possess handguns.  Nor does it distinguish between temporary non-immigrant residents and permanent residents.  Any classification based on the assumption that lawful permanent residents are categorically dangerous and that all American citizens by contrast are trustworthy lacks even a reasonable basis.

As one commentator noted, gun laws similar to the Massachusetts firearms regulatory regime were enacted "when fear

of foreign anarchists during the red-scare era, notions of
immigrant mental deficiencies, and stereotypes of immigrants'
laziness and proclivity towards crime dominated the popular and
political consciousness." Pratheepan Gulasekaram, *Aliens with
Guns: Equal Protection, Federal Power, and the Second Amendment*,
92 IOWA L. REV. 891, 909 (2007).  Those fears are inapplicable to
Fletcher and Pryal, who as lawful permanent residents have
established indefinite residence in the United States and are
even eligible for military service.  The possibility that some
resident aliens are unsuited to possess a handgun does not
justify a wholesale ban.  *See Application of Griffiths,* 413 U.S.
717, 725 (1973) (rejecting "the possibility that some resident
aliens are unsuited to the practice of law" as a "justification
for a wholesale ban").  In short, defendants have not sustained
their burden of showing that the statute passes muster under any
potentially applicable standard.  Consequently, I will grant
summary judgment in favor of plaintiffs on Count II.[20]

---

[20]  Because the Supreme Court has recently declared the
Second Amendment applicable to the States by virtue of the
Fourteenth Amendment, *McDonald v. City of Chicago*, 130 S. Ct.
3020 (2010), I need not embark on a discussion of the
constitutionality of the state law under the Equal Protection
clause.  Since I find that plaintiffs Fletcher and Pryal are
covered by the Second Amendment, their Equal Protection claim
does not do any additional work in this case.  I note, however,
that Massachusetts state equal protection law seems hospitable to
a state law challenge to different treatment of aliens and
citizens.  *See Finch v. Commonwealth Health Ins. Connector Auth.*,
959 N.E.2d 970 (Mass. 2012).  Plaintiffs, however, have not
raised state claims in this action.

C.   Preemption

For purposes of completeness, I will also address
plaintiffs' claim, made for the first time in their cross-motion
for summary judgment,[21] that the Massachusetts firearms
regulatory regime, as a regulation based on alienage, is
preempted by the exclusive federal right to regulate immigration.
To illustrate their argument, plaintiffs rely on the federal
statute, which regulates gun possession for aliens.  18 U.S.C. §
922(g)(5).

The Supreme Court has "long recognized the preeminent role
of the Federal Government with respect to the regulation of
aliens with our borders." *Toll v. Moreno*, 458 U.S. 1, 10 (1982).
Federal authority over aliens derives from various sources,
including the federal government's power to establish a uniform
rule of naturalization, its power to regulate commerce with
foreign nations, and its broad authority over foreign affairs.
*Id*.  The broad constitutional powers detained by the federal
government does not mean, however, "that every state enactment
which in any way deals with aliens is a regulation of immigration
and thus per se pre-empted by this constitutional power."
*DeCanas v. Bica*, 424 U.S. 351, 355 (1976) (superceded by the

---

[21]   The new preemption claim advanced by plaintiffs is not
contained in their complaint.  Plaintiffs have not yet moved to
amend their complaint, but instead offer to do so "if necessary."

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*).[22]

Two principles guide preemption analysis under the Supremacy Clause:[23]  (1) "the purpose of Congress is the ultimate touchstone," and (2) the presumption "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotations and citations omitted).  Congress could not have been more explicit when enacting the federal statute regulating firearms; it made clear that states would retain the authority to regulate firearms possession:

> No provision of this chapter shall be construed as
> indicating an intent on the part of the Congress to

_____

[22]   In *DeCanas,* the Supreme Court upheld a California law forbidding employers from "knowingly employ[ing] an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers."  424 U.S. 351, 352 (1976) (quoting Cal. Labor Code § 2805(a)).  Finding no clear intent of Congress to "preclude even harmonious state regulation touching on aliens in general, or the employment of illegal aliens in particular," *id*. at 358, the court reasoned "that aliens are the subject of state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *Id*.  Ten years after *DeCanas*, Congress enacted the Immigration Reform and Control Act (IRCA), 100 Stat. 3359.  IRCA makes it "unlawful for a person or other entity . . . to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien."  8 U.S.C. § 1324a(a)(1)(A).

[23]   "[T]he Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.

> occupy the field in which such provision operates to the
> exclusion of the law of any State on the same subject
> matter, unless there is a direct and positive conflict
> between such provision and the law of the State so that
> the two cannot be reconciled or consistently stand
> together.

18 U.S.C. § 927.  Congress's stated purpose aligns with the

Supreme Court's longstanding recognition of state authority to

regulate handguns.  *See McDonald*, 130 S. Ct. at 3047 ("[S]tate

and local experimentation with reasonable firearms regulations

will continue under the Second Amendment." (quoting the brief for

the thirty-eight state *amici*)); *Heller*, 554 U.S. at 626

("[N]othing in our opinion should be taken to cast doubt on

longstanding [state] prohibitions on the possession of firearms"

in certain cases).  There is no evidence that the Massachusetts

firearms regulatory regime conflicts with federal law.[24]

Plaintiffs make no claim that "compliance with both state and

federal law is impossible," or that "state law stands as an

obstacle to the accomplishment and execution of the full purposes

and objective of Congress." *United States v. Locke*, 529 U.S. 89,

109 (2000) (quotation marks and citation omitted).  Consequently,

I conclude that federal law does not preempt the Massachusetts

firearms regulatory regime so long as it is consistent with the

Second Amendment.

---

[24]  Recent caselaw, however, now suggests that the treatment
of aliens under the Massachusetts federal regulatory regime may
conflict with Massachusetts constitutional law. *See supra* note
20.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT defendants' motions to dismiss (Dkt. Nos. 12, 14, 16), as to the claims of the plaintiff organizations; but DENY those motions as to the claims of plaintiffs Fletcher and Pryal.

I conclude the Massachusetts firearms regulatory regime as applied to the individual plaintiffs, contravenes the Second Amendment. Accordingly I GRANT Fletcher and Pryal's motion for summary judgment (Dkt. No. 23) and direct that judgment enter enjoining  denial of firearm licenses and permits to them solely on the basis of their permanent resident alien status.


                              */s/ Douglas P. Woodlock*
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE